Scheduled for Oral Argument on _____

IN THE

# United States Court of Appeals

## FOR THE DISTRICT OF COLUMBIA CIRCUIT

**14-1060**

◆◆

FREDERICK ROTH,

*Petitioner,*

—v.—

MICHAEL P. HUERTA, Administrator; FEDERAL AVIATION ADMINISTRATION,

*Respondents.*

_____

ON PETITION FOR REVIEW FROM NTSB
NATIONAL TRANSPORTATION SAFETY BOARD

## BRIEF FOR PETITIONER

JOSEPH M. LAMONACA
JOSEPH M. LAMONACA,
  ATTORNEY AT LAW P.C.
755 North Monroe Street
Media, Pennsylvania 19063
(610) 558-3376
jlamonaca@avlaw.us

*Attorneys for Petitioner*

## <u>CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES</u>

## <u>PURSUANT TO CIRCUIT RULE 28 (a)(1)</u>

(A) PARTIES AND AMICI:

1. Petitioner is Frederick Roth, represented by Joseph Michael Lamonaca, Esquire.

2. Respondents are the Federal Aviation Administration and Administrator Michael P. Huerta, represented by Amanda Kate Bruchs, Esquire.

(B) RULINGS UNDER REVIEW:

National Transportation and Safety Board Order Number EA-5705, Docket Number SM-5191, dated February 25, 2014, in the Joint Appendix at A1420-A1442.

(C) RELATED CASES:

Counsel is unaware of any other related cases under review in this court or any other court.

i

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES...................................iv

GLOSSARY OF ABBREVIATIONS.............................vi

STATEMENT OF SUBJECT MATTER & APPELLATE JURISDICTION..1

STATEMENT OF ISSUES....................................3

STATUTES AND REGULATIONS...............................4

STATEMENT OF THE CASE..................................5

STATEMENT OF FACTS.....................................7

SUMMARY OF ARGUMENT...................................15

STANDING..............................................24

ARGUMENT..............................................24

    1) Whether the NTSB respectfully erred in concluding that credibility was the central and controlling issue in disregard of both NTSB and Federal Circuit Court precedent..........................................24

    2) Whether the NTSB respectfully erred in finding that Petitioner had psychosis in disregard of the medical opinions and diagnoses of the physicians who actually treated Petitioner over a period of time..............28

    3) Whether the NTSB erred in concluding that the Millwood records were reliable probative evidence.....35

    4) Whether the NTSB erred in holding Petitioner to a different standard than the Administrator.............43

    5) Whether the NTSB erred in disregarding the factual diagnosis change of Dr. Conrad Schmitt................49

6) Whether the NTSB erred in failing to consider the issue raised by Mr. Roth regarding the testimony of Attorney Timothy Polgar regarding credible factual explanations for Mr. Roth's "alleged" delusions.......52

7) Whether the NTSB erred in concluding that the Administrator timely filed an Amended Order after receiving "new medical evidence" in contradiction of the Administration's own internal procedures, orders, policy, rules, regulations, and guidance, contained in 49 CFR 821.24(e).........................................54

CONCLUSION.........................................59

COMBINED CERTIFICATIONS..............................60

# TABLE OF AUTHORITIES[1]

**CASES:**                                                          **PAGE :**

*<u>Administrator v. Dustman</u>,
      NTSB Order No. EA-5657, (2013).................5

*<u>Administrator v. Frohmuth & Dworak</u>,
      NTSB Order No. EA-3816 (1993)...........17,25,50

<u>Administrator v. Porco</u>,
      NTSB Order No. EA-5591 (2011)..............17,24

<u>Administrator v. Zummarraga</u>,
      NTSB Order No. EA-5618 (2012).................35

<u>Andrews v Shalala</u>,
      53 F.3d 1035(9th Cir.1995)....................34

<u>Beech Aircraft Corp. v. Rainey</u>,
      488 U.S. 153(1988) ...........................35

<u>Gallant v. Heckler</u>,
      753 F.2d 1450 (9th Cir, 1984)..............20,31

*<u>Hammock v. Bowen</u>,
      879 F.2d 498(9th Cir. 1989).........2,16,28,36,39

*<u>Lester v. Chater</u>,
      81 F.3d 821(9th Cir.1995)....19,20,28,31,33,34,52

*<u>Orn v. Astrue</u>,
      495 F.3d 625(9th Cir. 2007)....................2

<u>Petition of Wayne O. Witter</u>,
      NTSB Order No. EA-4500(1996)............19,30,32

<u>Pitzer v. Sullivan</u>,
      908 F.2d 502 (9th Cir.1990)................20,31

---

[1]Authorities upon which we chiefly rely are marked with an asterisk.

iv

<u>Smolen v. Chater</u>,
     80 F.3d 1273, (9th Cir. 1996)....................33

*<u>Richardson v. Perales</u>,
     402 U.S. 389(1971)...............................2

*<u>Vargas v. Sullivan</u>,
     898 F. 2d 293, (2nd Cir. 1990)..................34

**<u>STATUTES CITED:</u>**                                   **<u>PAGE :</u>**

5 U.S.C. §§ 701-706..................................2
5 U.S.C. § 556(d)...................................43
49 U.S.C. § 1153.................................1,24
49 U.S.C. § 44703...............................55,57
49 U.S.C. § 46110...............................1,24

**<u>REGULATIONS CITED:</u>**                               **<u>PAGE :</u>**

20 C.F.R. § 404.1502...............................33
20 C.F.R. § 416.927...............................33
49 C.F.R. § 821.12.................................57
*49 C.F.R. § 821.24(e)..........................55,57
49 C.F.R. § 821.64 .............................1,24

**<u>RULES:</u>**                                           **<u>PAGE :</u>**

Fed. R. Evid. 401 and 402..........................35

**<u>OTHER AUTHORITIES:</u>**                               **<u>PAGE :</u>**

Pilot's Bill of Rights, Public Law 112-153, Section
2,(b)(1).......................................2,5,48

Federal Aviation Administrations Guide for Aviation
Medical Examiners, Item 47......................12,48

v

## GLOSSARY OF ABBREVIATIONS

AME       Aviation Medical Examiner

CAA       Civil Aviation Authority

CALJ      Chief Administrative Law Judge

FAA       Federal Aviation Administration

HIMS      Human Intervention Motivation Study

NTSB      National Transportation Safety Board

OID       Oral Initial Decision

PBOR      Pilot's Bill of Rights

## STATEMENT OF SUBJECT MATTER & APPELLATE JURISDICTION

This matter is a Petition for Review of an Administrative Agency Final Order pursuant to 49 C.F.R. § 821.64 as provided in 49 U.S.C. §§ 1153 and 46110.

The Appellate Jurisdiction of this Honorable Court to hear and decide the Final Order of the National Transportation Safety Board ("NTSB") Order EA-5705 dated February 25, 2014 is conferred herein pursuant to 49 C.F.R. Part 821.64 as provided in 49 U.S.C. §§ 1153 and 46110.

Finally, a timely Petition for Review of an Administrative Agency Action was filed with this Honorable Court on April 16, 2014.

## STANDARD AND SCOPE OF APPELATE REVIEW

This matter is a Petition for Review of an Administrative Agency Final Order pursuant to 49 C.F.R. § 821.64 as provided in 49 U.S.C. §§ 1153 and 46110.

1

Judicial Review in this case is subject to the standard of review set forth in the Administrative Procedures Act, 5 U.S.C. §§ 701-706. The Administrative Procedures Act asks whether the agency's actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law", 5 U.S.C. § 706(2)(A). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971). A reviewing court must consider the entire record as a whole and consider adverse as well as supporting evidence, <u>Hammock v. Bowen</u>, 879 F.2d 498,501(9th Cir. 1989); and may not affirm simply by isolating a specific quantum of supporting evidence. <u>Orn v. Astrue</u>,495 F.3d 625,630(9th Cir. 2007).

Finally, review by this Honorable Court of the within Petition for Review pursuant to the Pilot's Bill of Rights ("PBOR"), Public Law 112-153, Section 2,(b)(1), is a matter of first impression.

2

## STATEMENT OF ISSUES

1) Whether the NTSB respectfully erred in concluding that credibility was the central and controlling issue in disregard of both NTSB and Federal Circuit Court precedent.

Suggested Answer: Yes

2) Whether the NTSB respectfully erred in finding that Petitioner had psychosis in disregard of the medical opinions and diagnoses of the physicians who actually treated Petitioner over a period of time.

Suggested Answer: Yes

3) Whether the NTSB erred in concluding that the Millwood records were reliable probative evidence.

Suggested Answer: Yes

4) Whether the NTSB erred in holding Petitioner to a different standard than the Administrator.

Suggested Answer: Yes

3

5) Whether the NTSB erred in disregarding the factual diagnosis change of Dr. Conrad Schmitt.

<u>Suggested Answer: Yes</u>

6) Whether the NTSB erred in failing to consider the issue raised by Mr. Roth regarding the testimony of Attorney Timothy Polgar regarding credible factual explanations for Mr. Roth's "alleged" delusions.

<u>Suggested Answer: Yes</u>

7) Whether the NTSB erred in concluding that the Administrator timely filed an Amended Order after receiving "new medical evidence" in contradiction of the Administration's own internal procedures, orders, policy, rules, regulations, and guidance, contained in 49 CFR 821.24(e).

<u>Suggested Answer: Yes</u>

## **STATUTES AND REGULATIONS**

See attached addendum.

4

## STATEMENT OF THE CASE

Initially, pursuant to <u>Administrator v. Dustman</u>, NTSB Order No. EA-5657, (2013), review by the National Transportation Safety Board of a medical qualifications case is reviewed as a whole, under de novo review. The de novo review by this Honorable Court of this matter pursuant to the Pilot's Bill of Rights ("PBOR"), Public Law 112-153, is a matter of first impression.

Petitioner, Frederick Roth, applied for an unrestricted First Class Medical, which application was Denied by the Federal Air Surgeon on August 29, 2011, citing a history of alcoholism and psychosis. Petitioner filed a timely Petition for Review on September 23, 2011. After the filing of the Petition for Review the Federal Air Surgeon forwarded an amended denial letter dated October 20, 2011, citing a history of psychosis as the only reason for the denial.

5

A hearing was scheduled for May 1st and 2nd, 2012 in Washington, D.C.. The hearing was continued over objection, and the Federal Air Surgeon filed a second amended denial letter dated June 25th, 2012, citing a history of both psychosis and major depression, recurrent, as the reason for the denial. Various other motions and pleading were filed by the parties.

Thereafter, another hearing was scheduled and held in this matter on October 22nd through October 24th, 2012, in Washington, D.C., before Chief Administrative Law Judge ("CALJ") Montaño. After the close of all evidence and after both sides rested, the CALJ decided that he needed to hear from a treating medical physician, Dr. Conrad Schmitt, in order to make a credibility determination. As such the hearing was continued until April 30, 2013 in Washington, D.C..

At the conclusion of the hearing on May 1, 2013, the CALJ issued an Oral Initial Decision("OID"), which decision was timely appealed to the NTSB by the

6

Petitioner.  The NTSB issued their Opinion and Order EA-5705 on February 25, 2014, which Order was timely appealed by Petitioner on April 16, 2014. The matter is now before this Honorable Court for disposition.


## STATEMENT OF FACTS

1. Captain Roth is a Captain for American Airlines.

2. In 1999 Dr. Conrad Schmitt diagnosed Captain Roth with Psychosis.

3. Dr. Conrad Schmitt worked for the Department of State as a regional medical officer from January 2004 until December 2011 when he retired, Joint Appendix (J.A.)[2] A806.

4. Dr. Schmitt was United States Diplomat, and had diplomatic status, (J.A. A807).

5. Dr. Conrad Schmitt, Captain Roth's Psychiatrist at Charter Grapevine in 1999, changed his 1999 diagnosis, eliminating Psychosis, (J.A. A170-A171, admitting Schmitt Deposition as Joint Exhibit J-1).

---

[2]The notation "J.A. [number]" refers to the location of the document in the Joint Appendix filed with this brief.

7

6. Dr. Schmitt made it clear he would have changed his psychosis diagnosis in 2000, or 2003 based on information known to him then, (J.A. A693, A830).

7. Captain Roth's treating Psychiatrist from the late 1990's through 2013, Dr. Michael Sturges, testified that Captain Roth was never psychotic, (J.A. A319-A321, A323-A325).

8. Dr. Joseph Pursch (J.A. A1105-A1109, A1116-A1117), Dr. Robert Elliott (J.A. A1155-A1175), Dr. George Glass (J.A. A1089-A1093), Rick Pipkin, Ph.D. (J.A. A1118-A1120), Dr. Garrett O'Conner, (J.A. A688),[3] Arthur Tarbox, Ph.d. (J.A. A1094-A1100), and Dr. Joseph Tordella[4], (J.A. A178-A180, A203-A204, A1110), have all stated in written medical opinions that Captain Roth was not and is not psychotic.

9. Barbara Huff, formerly the EAP Manager at American Airlines, and Jeanette Moss, LCDC, also concluded that

---

[3] Citing the Testimony of FAA Witness Dr. Michael Berry speaking to Dr. O'Conner's findings of no psychosis.

[4] Senior Aviation Medical Examiner ("AME"), Human Intervention Motivation Study ("HIMS") - Airline Drug and Alcohol Program

Captain Roth was never psychotic.

10. The Administrator's expert witness and employee Dr. Michael Berry never met, diagnosed or treated Captain Roth.

11. Dr. Berry is not a Psychiatrist, (J.A. A677).

12. The Administrator's expert witness Dr. Stuart Gitlow never met, examined or treated Captain Roth.

13. Dr. Rick Pipkin, the Millwood Hospital Director of Utilization, wrote several letters of record stating "that the facility keeps very poor records, I know this because I was the Utilization Review Director during this period. The Doctor that diagnosed Mr. Roth, was notorious for making a diagnosis without seeing the patient and not correcting the mis-diagnosis," (J.A. A1118-A1120).

14. Civil Aviation Authority in the United Kingdom, could not process Captain Roth's medical application because of the poor unreadable Millwood records, (J.A. A702-A703).

15. The CAA's psychiatrist Dr. Hayden Smith found that the handwritten records "don't describe a full range of psychotic features, the paranoia and all kinds of

9

other stuff, and there was no evidence of schizophrenia, no evidence of auditory hallucinations, thought disorder, primary delusions" (J.A. A703, A1123-A1127). Captain Roth does have a current unrestricted Canadian Medical Certificate, (J.A. A1247-A1250).

16. Dr. Schmitt testified that he relied upon his own personal observations of Captain Roth from 1999-2003, in changing his diagnosis  (J.A. A821, A1069).

17. Dr. O'Conner stated in his August 31, 2009 report that "Dr. Pipkin had actually been serving as an administrator and psychologist at Millwood Hospital at the time of Mr. Roth's Admission there, inspected the records in question and concluded that it could not be relied upon as an accurate reflection, clinical or otherwise, of Mr. Roth's actual clinical status during his hospitalization at Millwood. I found Dr. Pipkin's opinion to be highly credible, and this impression was validated in several phone conversations with Dr. Pursch, who himself had spoken several times with Dr. Pipkin, in addition to reading his letter," (J.A. A1112).

18.  Page 389, Ex. A-1, of the Millwood record has no patient name listed and no physician signature, (J.A. A1183).

19. Page 399, Ex. A-1, of the Millwood records shows the diagnosis of the patient to be "Anxiety Disorder" with no mention of psychosis at all, and another patient's name is crossed out at the bottom of the page with Frederick Roth handwritten in above, (J.A. A1193).

20. Millwood Hospital record at (J.A. A11830 is illegible and has a questionable ink mark in the signature line.

21. Millwood Hospital record at (J.A. A1193) has the word "ERROR" written in the patient section, with no further explanation).

22. Dr. Berry admitted that the Millwood records had "difficulties with them, they were sloppy et cetera," (J.A. A696, lines 8-15).

23. Dr. Berry was asked which physician performed the second opinion of Captain Roth at Millwood, to which he responded "I'm not sure you can tell from the medical records who it was, other than I believe it to be Khan,

11

...I'm assuming it was a physician because if you were asking for a second opinion, you would get a physician" (J.A. A698, lines 4-24).

24. Dr. Stuart Gitlow, the Administrator's expert psychiatrist, was never given the Deposition of Dr. Conrad Schmitt by the Administrator, at which deposition Dr. Conrad Schmitt changed his diagnosis of Captain Roth (J.A. A610-A611).

25. Dr. Joseph Tordella is a Senior AME, and a HIMS trained physician, who has been seeing Captain Roth for many years.

26. Dr. Tordella is delegated with the responsibility by the Administrator to evaluate Psychiatric Conditions. The <u>Federal Aviation Administrations Guide for Aviation Medical Examiners</u> sets forth in Item 47 the guidance for "Psychiatric Conditions." The first line of the guide states, "[t]he FAA does not expect the Examiner to perform a formal psychiatric examination. However, the Examiner should form a general impression of the emotional stability and mental state of the applicant." (Addendum (Add.) 29).

12

27. The Administrator filed three Denial letters in this matter. The first denial letter was August 29, 2011 which cited "alcoholism and psychosis," (J.A. A14-A15). The second denial was dated October 20, 2011 which cited only "psychosis" as the reason for the denial, (J.A. A142). The third denial letter was dated June 25th, 2012, two months after the scheduled first hearing in the matter, and cited "psychosis and major depression, recurrent," (Record ("R.") 976-983).

28. The CALJ stated "this is a close case. There's questions about records, there's questions about diagnosis, there's questions about when major depression severe was brought up in the course of these proceedings" (J.A. A784, lines 3-7), and stated he wanted to see if Dr. Schmitt's testimony would change any of the expert opinions (J.A. A787, lines 10-15).

29. Michael J. Smith is an American Airlines Captain and was in charge of the airlines alcohol and drug program, (J.A. A405-A406).

30. Captain Roth entered the HIMS program at the direction of Captain Smith, (J.A. A411, lines 18-22).

13

31. Captain Roth was presented for re-certification to the FAA by Captain Smith, (J.A. A418).

32. Captain Roth would be re-instated to his full seniority with American Airlines with an FAA Medical Certificate, (J.A. A421).

33. Captain Roth did everything he was asked to do regarding his alcohol issues, (J.A. A412, lines 18-24).

34. American Airlines Chief Pilot Captain Jirschele's understanding was that Captain Roth was in the airline HIMS program to "get him back flying again" (J.A. A432, lines 5-12).

35. Attorney Timothy Polgar was Captain Roth's Domestic Relations Attorney, and appeared in this NTSB proceeding, (J.A. A391).

36. On different occasions Ms. Jones, Mr. Roth's ex-wife, made threats that she was going to have the FAA or FBI arrest him, unless he acted according to the way she wanted Mr. Roth to act, (J.A. A391).

37. Ms. Jones advised Mr. Roth that their minor child Meghan was under investigation by the FBI and that her phone was being recorded and any communications between

14

Mr. Roth and Meghan was being recorded by the FBI, (J.A. A391-A392).

38. Ms. Jones did not comply on "numerous occasions" with court ordered visitation, requiring court intervention, (J.A. A393).

39. Ms. Jones, Mr. Roth's ex-wife, was found to be Bi-Polar by the court, (J.A. A394-A395).

40. Ms. Jones had trouble staying on her medications and failed to appear in court as a result, (J.A. A395).

41. That as a result of Ms. Jones psychiatric issues, Mr. Roth ultimately received full custody of his children, (J.A. A394).

42. That from 2001 until present Captain Roth has had no alcohol or drug issues.

## SUMMARY OF ARGUMENT

Although this fifteen year old case comprises volumes of records, documents, exhibits, and transcripts, the matter is fairly simple. Did the Petitioner, Captain Frederick Roth, a pilot with American Airlines, have an

15

established history of psychosis, precluding him from ever holding an Federal Aviation Administration ("FAA") Medical Certificate? The answer, as the record reflects, is no. Further, the NTSB's scant 10 page substantive opinion, (J.A. A1432-A1442), fails to support the CALJ's OID, rather it merely makes the inference that since the Chief Judge states it, so it must be so. In fact the CALJ and the NTSB both failed to consider the entire record as a whole and consider adverse as well as supporting evidence, Hammock v. Bowen, 879 F.2d 498,501(9th Cir. 1989). Selective supporting parts of the record were relied on but no adverse evidence was considered or even mentioned in the CALJ and the NTSB's final order. This was never so evident as the omission by both the CALJ and the NTSB to mention the failure by the Administrator to provide a copy of Dr. Schmitt's deposition to their hired expert, nor to mention the testimony of Attorney Timothy Polgar, Esquire, who substantiated Captain Roth's statements as in fact true.

16

The CALJ in his OID made arbitrary and capricious credibility determinations, which were made against the overwhelming weight of the record evidence, and erroneously concluded that Captain Roth did have an established history of psychosis. Further, since credibility was not the controlling inquiry, the CALJ and the NTSB should never have deferred to same, likewise this Honorable Appellate Court should not defer to same, Administrator v. Porco, NTSB Order No. EA-5591 (2011)[5]. "The question at issue does not involve issues of witness credibility...[t]he issue is not whether the respondent's version of events is truthful or whether they believe it to be," Administrator v. Frohmuth & Dworak, NTSB Order No. EA-3816 (1993). The physician's diagnoses were factually made, and in the case of Dr. Schmitt, factually changed; as such, witness credibility should never have been considered as a factor in the evaluation of their medical diagnoses.

---

[5] At page 18.

17

All of the treating Physicians, Psychiatrists, Psychologists and Clinicians that actually saw and treated Captain Roth have concluded that Captain Roth never had psychosis. Dr. Conrad Schmitt, his Psychiatrist at Charter Grapevine in 1999, **changed** his 1999 diagnosis, eliminating psychosis, (J.A. A170-A171). Dr. Schmitt made it clear he would have changed his psychosis diagnosis in 2000, or 2003 based on information known to him then, (J.A. A693, A830). Further, the original diagnosis of psychosis by Dr. Schmitt that he later amended, was consistently rebutted by numerous doctors and clinicians after 1999.

Captain Roth's treating Psychiatrist from the late 1990's through 2013, Dr. Michael Sturges, testified that Captain Roth was never psychotic. Dr. Joseph Pursch, Dr. Robert Elliott, Scott Lennox, LCSW (Licensed Clinical Social Worker) , Dr. George Glass, Rick Pipkin, Ph.d., Ken Ocean, LCDC (Licensed Clinical Drug Counselor), Dr. Garrett O'Conner, Arthur Tarbox, Ph.d., and Dr. Joseph Tordella[6],

---

[6] Senior AME, HIMS

have all met and examined Captain Roth, and stated in written medical opinions that Captain Roth was not and is not psychotic. Further, Barbara Huff, formerly the Employee Assistance Program Manager at American Airlines, made the same observations, and Jeanette Moss, LCDC, also concluded that Captain Roth was never psychotic. The NTSB held in Petition of Wayne O. Witter, NTSB Order No. EA-4500,"that we place a great deal of significance on the proposition that those doctors who interviewed petitioner in person had the best opportunity to observe and diagnosis his behavior."[7] Neither of the Administrator's two witnesses ever met Captain Roth, let alone examined and diagnosed him over any period of time. The Administrator's witnesses Dr. Berry and Dr. Gitlow never met, diagnosed or treated Captain Roth, and by Dr. Berry's own admission he is not even a Psychiatrist, (J.A. A677,lines 4-10).

Further, the United States Court of Appeals held in Lester v. Chater, 81 F.3d 821(9th Cir.1995), "that "the report of a non-treating, non-examining physician, combined

---

[7] Witter Opinion, Page 22

with the ALJ's own observance of the claimant's demeanor at the hearing" did not constitute "substantial evidence", and, therefore, did not support the commissioner's decision to reject the examining physician's opinion that the claimant was disabled." Lester, 81 F.3d at 831, citing Pitzer v. Sullivan, 908 F.2d 502, 506 n.4 (9th Cir.1990) and Gallant v. Heckler, 753 F.2d 1450,1456 (9th Cir, 1984). In the instant matter, the opinion of the Administrator's expert, Dr. Stuart Gitlow, who never saw or examined Captain Roth, does not constitute "substantial evidence."

As to the need for the court to call Dr. Conrad Schmitt as the court's witness, and thereafter continue the case for six months, the decision by the court was a clear abuse of discretion. This case was procedurally finalized on October 24, 2012. Both sides rested (J.A. A779) and the CALJ accepted into evidence the stipulated deposition testimony of Dr. Conrad Schmitt, which was presented as a stipulated Joint Exhibit on behalf of the Administrator and Petitioner. The parties were ready for final argument when the CALJ, in an unprecedented manner, ruled to continue the

case as he needed to hear the testimony of Dr. Conrad Schmitt,(J.A. A784). The CALJ stated "this is a close case. There's questions about records, there's questions about diagnosis, there's questions about when major depression severe was brought up in the course of these proceedings," (J.A. A784, lines 3-7), and stated he wanted to see if Dr. Schmitt's testimony would change any of the expert opinions (J.A. A787).

This original ruling of the CALJ defies logic when looking at the record as a whole. On 10/24/12 the CALJ states this is a "close case" and then hears the testimony of one further witness, Dr. Conrad Schmitt, and thereafter finds that 100 percent of the Administrator's case and witnesses were credible, and that zero percent of Captain Roth's witnesses, case, or exhibits were credible, or had any positive bearing on this "close" case. The CALJ's statement that the case was close is what prompted the lack of objections to hearing Dr. Conrad Schmitt's live testimony many months after both sides in this matter rested, and Dr. Conrad Schitt's deposition was duly received into evidence.

21

The Millwood hospital records in this matter were at
critical issue. Dr. Rick Pipkin, the Millwood Hospital
Director of Utilization, wrote several letters of record
stating "that the facility keeps very poor records, I know
this because I was the Utilization Review Director during
this period. The Doctor that diagnosed Mr. Roth, was
notorious for making a diagnosis without seeing the
patient and not correcting the mis-diagnosis," (J.A.
A1118-A1120). Dr. Pipkin's Millwood record commentary was
mirrored by numerous other practitioners.

Critically, both the NTSB and the CALJ, in an
arbitrary and capricious fashion, failed to address the
testimony of Captain Roth's Domestic Relation's attorney,
Timothy Polgar, who appeared in this matter and presented
compelling evidence regarding facts that explained Captain
Roth's alleged delusions, (J.A. A390-A395).

Finally, as to Public Policy, Captain Roth entered the
HIMS program at the direction of Captain Michael J. Smith,
(J.A. A411, lines 18-22). Captain Smith is an American

22

Airlines Captain, and he was in charge of the airline's alcohol and drug program, (J.A. A405-A406). During Captain Roth's lengthy participation in the airline's HIMS Program, it was Captain Roth's as well as American Airlines Chief Pilot Captain Jirschele's understanding that Captain Roth was in the HIMS program to "get him back flying again" (J.A. A432, lines 5-12).

Captain Roth was presented for re-certification to the FAA by Captain Smith, (J.A. A418), but was denied by the Administrator despite the fact that Captain Roth did everything he was asked to do regarding his alcohol issues, (J.A. A412). Being placed in an airline program designed to re-certify pilots with alcohol and drug issues, doing all you are asked to do, and then being told by the Administrator that you will not be re-certified regardless, is a serious breach of public policy, and sends a very confusing message to other pilots considering entry into the HIMS program.

## STANDING

Petitioner/Appellant Frederick Roth has standing in this Petition for Review as a Petitioning Appellant and Party in an Administrative Agency Action pursuant to 49 C.F.R. Part 821.64, as provided in 49 U.S.C. §§ 1153 and 46110.

## ARGUMENT

## 1) Whether the NTSB respectfully erred in concluding that credibility was the central and controlling issue in disregard of NTSB and Federal Circuit Court precedent.

The CALJ spent an ample amount of his OID attacking the credibility of all of Captain Roth's medical witnesses, when, as cited in <u>Administrator v. Porco</u>, NTSB Order EA-5591 (2011), credibility was not the controlling inquiry. Further, his attack of Captain Roth's credibility came without any basis or support in the record. The CALJ and NTSB claim that Captain Roth manipulated all of his physicians and clinicians, (J.A. A1433), which none of the Administrator's witnesses testified to, or any of the

24

reports in evidence even suggest. More persuasively is
that fact that none of the physicians that treated Captain
Roth testified at the hearing that Captain Roth in any way
manipulated any documents, statements, or that Captain
Roth was not fully cooperative with them at all times. The
NTSB, in a very scant one paragraph review of the Law
Judge's credibility findings,(J.A. A1432), failed to
substantiate any of the findings other than inferring that
since the CALJ said all of Captain Roth's physicians were
not credible, therefore they would affirm it. As such,
this finding by the NTSB was also arbitrary and
capricious, and against the weight of the record evidence.

"The question at issue in this case does not involve
issues of witness credibility...[t]he issue is not whether
the respondent's version of events is truthful or whether
they believe it to be," Administrator v. Frohmuth &
Dworak, NTSB Order No. EA-3816 (1993). The physician's,
clinician's, and psychologist's diagnoses in evidence were
factually made, and in the case of Dr. Schmitt, factually
changed. All of the treating physicians, psychiatrists,

psychologists and clinicians that actually examined and treated Captain Roth have concluded that Captain Roth never had psychosis. Dr. Conrad Schmitt, his psychiatrist at Charter Grapevine in 1999 through to 2003, changed his 1999 diagnosis to eliminate psychosis, (J.A. A170). Further, Dr. Schmitt testified definitively that he would have changed his psychosis diagnosis in 2000, or 2003 based on information known to him then,(J.A. A693 lines 17-24, A830 lines 6-8).

The original diagnosis of psychosis by Dr. Schmitt that he later changed has been consistently rebutted by numerous doctors and clinicians since 1999. Captain Roth's treating Psychiatrist from the late 1990's through 2013, Dr. Michael Sturges, testified that Captain Roth was never psychotic, (J.A. A319-A321, A323-A325). Numerous physicians who have all met and examined Captain Roth, have stated in written medical opinions that Captain Roth was not and is not psychotic. Yet this record evidence was discounted as not credible based upon the CALJ arbitrarily determining that Captain Roth deliberately manipulated

26

them, (J.A. A1433), without any citation to the record where Captain Roth is accused of manipulating his physicians. Even if credibility had been a determining factor, this omnibus credibility determination remains arbitrary and capricious when it is based solely upon an inference the CALJ makes that was never contained in the original record.

The NTSB attempts to justify allowing the CALJ's credibility determinations of the physicians, and thus by default the credibility of their diagnoses, by saying Petitioner's attacking the credibility of the Millwood Hospital records "made credibility a central issue." (J.A. A1435. The record shows the Millwood records are full of factual errors and self-contradictions, which is an entirely different scenario than when the CALJ made his decision to reject all of Captain Roth's treating and examining physician's opinions that psychosis had never existed, based solely upon his finding that they were "not credible" when the veracity of their diagnosis was never in question. The CALJ rejected the examining physician's

27

testimony but failed to give, "specific, legitimate reasons for doing so, and those reasons are supported by *substantial record evidence*," <u>Lester v. Chater</u>, 81 F.3d 821,831(9th Cir.1995), thus that decision was arbitrary, capricious, and against the clear weight of the record evidence.


**2) Whether the NTSB respectfully erred in finding that Petitioner had psychosis in disregard of the medical opinions and diagnoses of the physicians who actually treated Petitioner over a period of time**.


The CALJ made arbitrary and capricious credibility determinations, which were made against the overwhelming weight of the record evidence, to conclude that Captain Roth did have an established history of psychosis, which determinations were simply adopted adhoc by the NTSB (J.A. A1420-A1442). In the instant matter, the CALJ and the NTSB failed to consider the entire record as a whole, and failed to consider any adverse as well as supporting evidence, <u>Hammock v. Bowen</u>, 879 F.2d 498,501(9th Cir. 1989). Very selective supporting parts of the record were relied on by the CALJ, but none of Petitioner's adverse

28

evidence was considered or even mentioned in the CALJ and the NTSB's final order. All of the treating physicians, psychiatrists, psychologists and clinicians that actually examined and treated Captain Roth have concluded that Captain Roth never had psychosis. Dr. Conrad Schmitt, his psychiatrist at Charter Grapevine in 1999 through to 2003, changed his 1999 diagnosis to eliminate psychosis, (J.A. A170). Further, Dr. Schmitt testified definitively that he would have changed his psychosis diagnosis in 2000, or 2003 based on information known to him then,(J.A. A693 lines 17-24, A830 lines 6-8). The original diagnosis of psychosis by Dr. Schmitt, that he later changed, has been consistently rebutted by numerous doctors and clinicians since 1999.

Dr. Michael Sturges, Captain Roth's treating Psychiatrist from the late 1990's through 2013, testified that Captain Roth was never psychotic, (J.A. A319-A321, A323-A325). Dr. Joseph Pursch (J.A. A1105-A1109, A1116-A1117), Dr. Robert Elliott (J.A. A1155-A1175), Dr. George Glass (J.A. A1089-A1093), Rick Pipkin, Ph.d. (J.A. A1118-

29

A1120), Dr. Garrett O'Conner, (J.A. A688 lines 2-10),[8] Arthur Tarbox, Ph.d. (J.A. A1094-A1100), and Dr. Joseph Tordella[9](J.A. A178-A180, A203-A204, A1110), have all stated in written medical opinions that Captain Roth was not, and is not, psychotic.

Pursuant to Petition of Wayne O. Witter, NTSB Order No. EA-4500 (1996), the NTSB held "that we place a great deal of significance on the proposition that those doctors who interviewed petitioner in person had the best opportunity to observe and diagnose his behavior."[10] Neither of the Administrator's two witnesses ever met Captain Roth, let alone observed and diagnosed him over any period of time. Dr. Berry never met, diagnosed or treated Captain Roth, and further, by his own admission is not a psychiatrist,(J.A. A677,lines 4-10). The United States Court of Appeals also held that "the report of a

---

[8] Citing the Testimony of FAA Witness Dr. Michael Berry speaking to Dr. O'Conner's findings of no psychosis.

[9] Senior AME, HIMS

[10] Witter Opinion, Pg. 22

30

non-treating, nonexamining physician, combined with the CALJ's own observance of the claimant's demeanor at the hearing did not constitute 'substantial evidence', and, therefore, did not support the commissioner's decision to reject the examining physician's opinion that the claimant was disabled." <u>Lester</u>, at 831, citing <u>Pitzer v. Sullivan</u>, 908 F.2d 502, 506 n.4 (9th Cir.1990) and <u>Gallant v. Heckler</u>, 753 F.2d 1450,1456 (9th Cir, 1984). In the instant matter, the opinion of the Administrator's expert, Dr. Gitlow, who never saw or examined Captain Roth, does not constitute "substantial evidence."

Further, "more weight should be given to the opinion of a treating physician than to a non-treating physician, and more weight should be given to the opinion of an examining physician than to a non-examining physician." <u>Lester</u>, at 830. The Administrator presented Dr. Schmitt with various documents at his deposition, which Dr. Schmitt stated he had not reviewed when he revised his diagnosis of Captain Roth (J.A. A999-A1088). The CALJ choose to view the lack of document review as Captain

Roth potentially skewing Dr. Schmitt's opinion, instead
of crediting Dr. Schmitt's testimony that he simply
relied upon his own personal observations of Captain Roth
from 1999-2003 in changing his diagnosis. (J.A. A821
lines 7-11, A1069 lines 7-11,). The CALJ choose not to
weigh Dr. Schmitt's opinion as a "treating physician"
with due consideration, instead relying upon the opinion
of an expert who never even met Captain Roth prior to the
hearing. Further, Dr. Schmitt testified definitively that
he would have changed his psychosis diagnosis in 2000, or
2003 based on information known to him then, (J.A. A830
lines 6-8, A693 lines 17-24), and more persuasively, the
ten years of records the CALJ felt he should have
reviewed were not even in existence in 2000, or 2003, at
the time Dr. Schmitt testified he would have changed his
diagnosis.


The NTSB Board's holding in Petition of Wayne O.
Witter NTSB Order No. EA-4500 (1996) is supported by a
large body of case law. In evaluating medical opinions,
the case law and regulations distinguish among the

32

opinions of three types of physicians: (1) those who treat the claimant (treating physician); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who never examine or treat the claimant (non-examining physicians). As a general rule, the opinions of the treating physicians are given greater weight than those of other physicians, because treating physicians are employed to cure and therefore have a greater opportunity to know and observe the claimant, Lester v. Chater, 81 F.3d 821,830 (9ᵗʰ Cir. 1995), Smolen v. Chater, 80 F.3d 1273, (9ᵗʰ Cir. 1996), and 20 C.F.R. § 404.1502 and 416.927. In the instant matter the CALJ erred in giving no weight to all of the treating physicians and clinicians who saw Captain Roth, and who diagnosed and treated Captain Roth, and erroneously found the testimony of the Administrator's two witnesses who never met, treated or diagnosed Captain Roth, as "substantial evidence". Further, the record puts great doubt on whether Dr. Kahn or the mystery second opinion Doctor at Millwood ever even saw Captain Roth, yet the NTSB cites them as "contemporaneous medical records"

33

(J.A. A1436).

Reports of medical advisors who have not personally examined the claimant deserve little weight in the overall evaluation of claimant, or in this case Captain Roth, <u>Vargas v. Sullivan</u>, 898 F. 2d 293, (2nd Cir. 1990). "[L]ike the opinion of a treating doctor, the opinion of an examining doctor, even if contradicted by another doctor, can only be rejected for **_specific and legitimate reasons_** that are supported by substantial evidence on record." <u>Lester</u>,81 F.3d at 830, 831, citing <u>Andrews v Shalala</u>,53 F.3d 1035,1043(9th Cir.1995)(Emphasis added). As such, when the CALJ made his decision to reject all of Captain Roth's treating and examining physician's opinions that psychosis had never existed based solely upon his finding that they were "not credible" when the veracity of their diagnosis was never in question, and without his citing any actual substantial evidence on record to support his ruling, that decision was arbitrary, capricious, and against the clear weight of the record evidence.

34

### **3) Whether the NTSB erred in concluding that the Millwood records were reliable probative evidence**.

The NTSB has long held that for evidence to be admissible the evidence must be "reliable, probative, and credible," Administrator v. Zummarraga, NTSB Order No. EA-5618 (2012). Reliable has the plain meaning of trustworthy and worthy of confidence, and in short, the Millwood records were far from reliable as is required by law and rules. Further, the Administrator attempted to pick and choose which Millwood records they would rely upon, and the NTSB did the same in their February 25, 2014 Order.

The United States Supreme Court held in Beech Aircraft Corp. v. Rainey, 488 U.S. 153, 172 (1988) that "when a party has made use of one portion of a document such that misunderstanding or distortion can be averted only through presentation of another portion, the material required for completeness is ipso facto relevant and therefore admissible under FRE 401 and 402." In the instant matter it would be impermissible and prejudiced

35

for the CALJ to only consider that limited portion of the
Millwood records that references psychosis, without
considering those portions of the Millwood records that
show a completely contradictory diagnosis of anxiety
disorder as Captain Roth's diagnosis,(J.A. A1193).
Similarly, it was also arbitrary and capricious, and an
abuse of discretion for the NTSB to omit certain Millwood
records, used in the case as a whole, (J.A. A1440-A1441).
These adverse records must be considered by the CALJ and
NTSB pursuant to, Hammock v. Bowen, 879 F.2d 498,501(9th
Cir. 1989), but were omitted in an arbitrary and
capricious manner.


The Millwood hospital records in this matter were at
critical issue, especially in light of the fact that Dr.
Conrad Schmitt changed his questionable 1999 diagnosis
from Charter Grapevine. Dr. Rick Pipkin, the Millwood
Hospital Director of Utilization wrote several letters of
record stating "that the facility keeps very poor
records, I know this because I was the Utilization Review
Director during this period. The doctor that diagnosed

36

Mr. Roth was notorious for making a diagnosis without seeing the patient and not correcting the mis-diagnosis," (J.A. A1118-A1120). Dr. Pipkin's Millwood records commentary was mirrored by numerous other practitioners, including Dr. Garrett O'Conner. Dr. O'Conner stated in his August 31, 2009 report that "Dr. Pipkin had actually been serving as an administrator and psychologist at Millwood Hospital at the time of Mr. Roth's Admission there, inspected the records in question and concluded that it could not be relied upon as an accurate reflection, clinical or otherwise, of Mr. Roth's actual clinical status during his hospitalization at Millwood. I found Dr. Pipkin's opinion to be highly credible, and this impression was validated in several phone conversations with Dr. Pursch, who himself had spoken several times with Dr. Pipkin, in addition to reading his letter," (J.A. A1112).

Support of the inaccuracy of the Millwood records continued to be echoed by other Aviation Authorities, namely the Civil Aviation Authority ("CAA") in the United

37

Kingdom, which authority could not process Captain Roth's medical application because of the poor, unreadable Millwood records,(J.A. A702-A703). The CAA's psychiatrist Dr. Hayden Smith found that the handwritten records "don't describe a full range of psychotic features, the paranoia and all kinds of other stuff, and there was no evidence of schizophrenia, no evidence of auditory hallucinations, thought disorder, primary delusions" (J.A. A703 lines 1-12, A1123-A1127).

A review of the Millwood records themselves proves the records' non-reliability, and the NTSB's, the CALJ's, and the Administrator's erroneous reliance upon them was a clear abuse of discretion. On page 389 of Ex. A-1,(J.A. A1183) the Millwood record has no patient name listed and no physician signature. Page 399 of Ex. A-1,(J.A. A1193) of the Millwood records is the most egregious. This page shows the diagnosis of the patient to be "Anxiety Disorder" with no mention of psychosis at all, and another patient's name is crossed out at the bottom of the page with "Frederick Roth" handwritten in above.

Pursuant to Hammock v. Bowen, 879 F.2d 498,501(9th Cir. 1989), this adverse evidence simply cannot be dismissed by the CALJ and NTSB. These serious inconsistencies were directed to the Administrator's witness Dr. Berry, who decided to pick and choose which diagnoses in the Millwood records he would rely upon, (J.A. A696-A698). During the aforementioned testimony Dr. Berry was very evasive, although he did admit the Millwood records had "difficulties with them, they were sloppy et cetera," (J.A. A696 lines 11-15). Dr. Berry was asked which physician performed the second opinion of Captain Roth at Millwood, to which he responded "I'm not sure you can tell from the medical records who it was, other than I believe it to be Khan, ...I'm assuming it was a physician because if you were asking for a second opinion, you would get a physician" (J.A. A698 lines 4-24). Dr. Berry did go on to say that "I think I have already admitted that these were sloppy records", (J.A. A698 lines 24-25).

Ultimately, the CALJ ruled that even though there were "some errors in the [Millwood] records, they did not

39

render the entire medical record unreliable nor do these errors nullify Dr. Khan's diagnosis," (J.A. A1413 lines 2-4) while applying a completely different standard to other records. The reality of Dr. Khan's "diagnosis" of "psychosis" is that it cannot be definitively cited to in the record, as it was never legibly written in the Millwood records, nor were the records signed,(J.A. A1179-A1237). He repeatedly refers to Dr. Pipkin's letters as "unsigned" in his opinion, (J.A. A161 line 9; A1362 line 20; A1389 Line 1.) The record clearly shows Dr. Pipkin's letters are indeed signed (J.A. A1119-A1120), moreover on cross with Dr. Tordella, the Administrator spent some time asking about Dr. Pipkin's signature, the way he addressed it, and what superlatives Dr. Pipkin used. (J.A. A259-A262). Thus the "unsigned" determination is pure fiction. Further, the CALJ appears to complete the Administrator's argument for him in his OID when he states that Dr. Tordella placed their authenticity in question on cross-examination, (J.A. A1388 lines 22-24), which Dr. Tordella never did. The Administrator's cross regarding these letters consisted

40

of simply asking if the witness saw certain typos,(J.A.
A259-A262), but he never asked if that made the letters
unauthentic or suspect, yet the CALJ, in an abuse of
discretion, ruled that "apparently" (J.A. A1360 line 24)
these questions were an attempt by the Administrator to
question their authenticity, and that "I find them
suspect." (J.A. A1389 lines 2-3). No similar
determination was made by the CALJ regarding the Millwood
records, in which Dr. Khan's signature is actually
missing (J.A. A1180, A1186) or illegible (J.A. A1179,
A1183), and the much touted "second opinion" of psychosis
that the NTSB relies upon (J.A. A1436) from Millwood is
unsigned,(J.A.A1190), and in fact no one was ever able to
determine the identity of that Doctor, (J.A. A698 lines
4-24).

   None of the above material and relevant facts and
issues concerning the "Millwood records" were
specifically addressed by the NTSB in their 2/25/14
Order. The NTSB continued to state in their order that
the Chief Law Judge "instead chose to rely on the medical

41

records, including those of Dr. Khan, who was also a treating physician," (J.A. A1438). However, the NTSB failed to mention that the CALJ did not rely on all the records, but only on very select records in an arbitrary and capricious manner.

Finally, the NTSB states that "we find petitioner's contemporaneous medical records created by his treating physicians establish he had a specifically disqualifying medical condition due to his history of and diagnoses of psychosis," (J.A. A1436). The word contemporaneous is used here to support the CALJ's finding, but in fact, when Captain Roth presented at Millwood, the record reflects that Millwood may have been merely carrying over the prior 1999 Grapevine diagnosis, and as such the contemporaneous (fifteen month nexus in time) from Grapevine to Millwood supports Captain Roth's position. Captain Roth gave Millwood his medical history to include the Grapevine diagnosis, which became part of Millwood's imperfect records. The original Grapevine diagnosis was changed by Dr. Schmitt, Dr. Kahn's records are critically

42

poor, not signed, not legible, and it is unclear if in fact Dr. Kahn saw Captain Roth at all,(J.A. A1118-A1120). Finally, there is the unnamed mystery second opinion Doctor that Captain Roth states he never saw, and cannot be identified by the Administrator. As such, the Millwood records were not reliable, probative, and credible according to the standards for evidence set forth in the Administrative Procedures Act, 5 USC 556(d).

### 4) Whether the NTSB erred in holding Petitioner to different standards than the Administrator.

The CALJ applied different standards with the Administrator regarding reviewing and possessing records than with the Petitioner, and also applied different standards to the testimony of Petitioner's witness Dr. Tordella than the Administrator's witness Dr. Berry, neither of whom are psychiatrists. As to the records, the CALJ choose to mandate that the Petitioner's witnesses had to possess every document over the 14 year history of this case, yet which documents were included in "every" was never defined. The Administrator's expert Dr. Gitlow

never treated or met Captain Roth, and further was never given the critical 90-page deposition of Dr. Conrad Schmitt, in which Dr. Schmitt changed his diagnosis of Captain Roth (J.A. A611 lines 1-20), yet the CALJ still found Dr. Gitlow credible and gave him more weight. Thus, because the Petitioner's treating expert witnesses may not have reviewed every single scrap of medical records across 14 years, their testimony was erroneously dismissed as not credible and unpersuasive, but the Administrator's non-examining expert witness' lack of review of the crucial 90-page deposition of the treating psychiatrist, whose diagnosis was the crux of the Administrator's case, did not deter the CALJ from preferring his testimony in a totally arbitrary and capricious manner.

The NTSB similarly made the unsupported determination that, "[n]either Dr. Tordella nor Dr. Sturges reviewed the entire medical record," (J.A. A1435), which finding is not supported by the record, and is simply untrue. Yet the NTSB failed to even comment on the Administrator's

44

non-examining expert Dr. Gitlow not reviewing Dr. Schmitt's Deposition on his changed diagnosis, when Dr. Gitlow was intentionally never provided with that crucial deposition by the Administrator. Dr. Gitlow, the Administrator's non-examining expert psychiatrist, was never given the critical Deposition of Dr. Schmitt, at which deposition Dr. Schmitt changed his diagnosis of Captain Roth (J.A. A611 lines 1-20). Why the Administrator never gave Dr. Gitlow the deposition defies logic, but this was of no concern to either the CALJ or the NTSB as it related to the Administrator's key witness "not having documents." Further inquiry of Administrator's non-examining expert Dr. Berry regarding the issue of the Schmitt deposition not being given to the FAA own's expert led to nothing but avoidance. Dr. Berry was asked, "and I'm perplexed about this question... But why was Dr. Gitlow not given Dr. Schmitt's June 4th deposition." Dr. Berry responds, "I can't answer that question. I have no idea. I don't know. When I talked to him on-when we started this on Tuesday, I asked him the question, I said, well, you've read Dr.

45

Schmitt's deposition testimony didn't you? And he said no, I didn't," (J.A. A658).

The CALJ held that failing to review records made Petitioner's treating witnesses "not credible," but then held the Administrator to a completely different standard when critical records were intentionally withheld from their own non-examining expert. This application of different standards is arbitrary, capricious, biased, and a complete abuse of discretion. Further, the NTSB never set forth with any specificity what records were not reviewed, of the volumes of records accumulated over the 14 year period since the inception of this matter in 1999. Finally, the NTSB justifies the use of credibility determinations upon the reasoning that since Petitioner attempted to discredit the Millwood records, it is only fair that credibility determinations should be made upon his examining physicians. However, it is an entirely different matter to discredit an Exhibit as not reliable, probative, and credible, than it is to discredit examining physicians as a back door way of discrediting

their diagnoses. All of the known examining physician's diagnoses were entered into the record as Exhibits, and not a single one was objected to, with the exception of Dr. Kahn and the nameless Millwood second opinion Doctor, which dispute still exists of record whether they ever saw Captain Roth at all.

As to Dr. Tordella and Dr. Berry, the CALJ erred by giving no weight to treating physician Dr. Tordella's testimony because he is not a psychologist or psychiatrist, (J.A. A 1363 lines 18-25), but arbitrarily and capriciously found non-examining physician Dr. Berry credible to testify on behalf of the Administrator, also as a non-psychiatrist.

Dr. Joseph Tordella is a Senior AME, and a HIMS trained physician, who has been treating Captain Roth for many years. His testimony was arbitrarily and capriciously discounted by the CALJ who failed to recognize that as a Senior AME, Dr. Tordella is delegated with the responsibility by the Administrator to evaluate

47

Psychiatric Conditions. The <u>Federal Aviation Administrations Guide for Aviation Medical Examiners</u> sets forth in Item 47 the guidance for "Psychiatric Conditions." The first line of the guide states, "[t]he FAA does not expect the Examiner to perform a formal psychiatric examination. However, the Examiner should form a general impression of the emotional stability and mental state of the applicant." This places Dr. Tordella in a unique position as the only witness at the hearing who examined Captain Roth numerous times and was also **_charged by the Administrator_** to form an impression for the Administrator of his "emotional stability and mental state" which Petitioner urges this Honorable Court to recognize under the independent review standard, and the Pilot's Bill of Rights, Public Law 112-153, Section 2,(b)(1) standard which is a matter of first impression for Appellate Court Review. Thus the CALJ's outright dismissal of Dr. Tordella's testimony as "not credible" was arbitrary and capricious, and was not addressed by the NTSB in their Opinion and Order.

48

### **5) Whether the NTSB erred in disregarding the factual diagnosis change of Dr. Conrad Schmitt.**

Dr. Conrad Schmitt was Captain Roth's treating Psychiatrist at Charter Grapevine in 1999, and then through to 2003. He is well respected in the industry, recently retired from the United Stations State Department where he served for eight years as a Foreign Services Psychiatrist worldwide, (J.A. A806). He served his country with honor and had no veracity or ethical issues that were raised of record.

Dr. Schmitt first examined and diagnosed Captain Roth with psychosis during Captain Roth's brief stay at Charter Grapevine in 1999. This diagnosis was questioned over many years by many physicians and practitioners. As Captain Roth's treating psychiatrist, Dr. Schmitt later changed his 1999 diagnosis to eliminate psychosis, (J.A. A170, admitting Schmitt Deposition as Joint Exhibit J-1). Further, Dr. Schmitt made it clear he would have changed his psychosis diagnosis in 2000, or 2003 based on information known to him then, but was not asked to do so

49

or review same (J.A. A830 lines 6-8), and testified that
he "discovered that much of what I had construed as
delusional was in fact true based on an attempt by his
then wife to complete a most contentious divorce," (J.A.
A693 lines 17-24). This new medical diagnosis came from
Captain Roth's treating psychiatrist, whose credibility
regarding the issue was not the question. "The question
at issue does not involve issues of witness
credibility...[t]he issue is not whether the respondent's
version of events is truthful or whether they believe it
to be," as the physicians diagnoses were factually made,
and in the case of Dr. Schmitt, factually changed,
Administrator v. Frohmuth & Dworak, NTSB Order No. EA-
3816 (1993). Captain Roth was also required to waive his
attorney-client privilege (J.A. A389-A390), in order to
allow his former divorce attorney, Timothy Polgar, to
testify about the actual threats and accusations Captain
Roth received from his ex-wife in late 1999 and early
2000. Attorney Polgar testified credibly, and established
that many of the claims of delusions were indeed "facts,"
(J.A. A391-A392). This information supports Dr. Schmitt's

50

assessment that in 2003 he would have changed his diagnosis based on information that he came to know then, being that the alleged "delusions," were not delusions at all but had a factual origin. None of Mr. Polgar's testimony was addressed by the NTSB in their order despite being raised as an issue, (R. 4467-4584).

Further, and most critical, is the fact that the CALJ and the NTSB cannot have it both ways. Even though the issue of the changed diagnosis is not one of credibility, the question remains; if the CALJ found Dr. Schmitt's changed/amended diagnosis not to be credible, then how can he find Dr. Schmitt's original diagnosis or explanation thereof to be blanketly credible? This issue was scantily addressed by the NTSB, (J.A. A1433) in two sentences of their order, simply just re-stating what the CALJ arbitrarily stated.

Finally, the NTSB justifies the use of credibility determinations upon the reasoning that since Petitioner attempted to discredit the Millwood records, it is only

fair that credibility determinations should be made upon his examining physicians. However it is an entirely different matter to discredit an Exhibit than it is to discredit an examining physician as a back door way of discrediting his diagnosis. Here the CALJ rejected Dr Schmitt's testimony but failed to give "specific, legitimate reasons for doing so, and those reasons are supported by substantial record evidence," <u>Lester</u>, 831, thus that decision was arbitrary, capricious, and against the clear weight of the record evidence.


**6) Whether the NTSB erred in failing to consider the issue raised by Mr. Roth regarding the testimony of Attorney Timothy Polgar regarding credible factual explanations for Mr. Roth's "alleged" delusions.**


The CALJ took the erroneous position that absent documents, a witness's oral sworn statements carried no weight, which position the NTSB failed to address at all in their order. Captain Roth was required to waive his attorney-client privilege (J.A. A389-A390), in order to allow his divorce attorney to testify and to support the issues he had with his ex-wife in late 1999 and early

52

2000, (J.A. A391-A395). He testified credibly, and refuted many of the claims of delusions as "facts," (J.A. A392-A395). However, the CALJ discounted this credible testimony from a member of the Bar, because Attorney Polgar provided no physical records or written documentary evidence to support his testimony, (J.A. A1374 lines 2-5, and lines 17-19). To suggest that unless a witness provides documentation for everything they testify to under oath is clear error of law. Attorney Polgar was being asked to testify about events that happened well over ten years ago, and whether he possessed records or not, his testimony was pivotal in establishing that Captain Roth was not delusional, but in fact was experiencing the wrath of a bitter ex-wife in a bad divorce, and his "paranoid delusions and grossly disorganized thoughts" (J.A. A1437) were based upon actual events and were not psychosis. In fact, many records did not exist at all, as Attorney Polgar testified that he handled certain of the issues by simply calling opposing counsel, (J.A. A392 lines 3-16).

This critical issue is further compounded by the fact that the NTSB failed to address this issue at all in their order, and respectfully selectively choose to use just two sentences from the CALJ's Order, and not consider the overwhelming weight of additional evidence.


**7) Whether the NTSB erred in concluding that the Administrator timely filed an Amended Order after receiving "new medical evidence" in contradiction of the Administration's own internal procedures, orders, policy, rules, regulations, and guidance, contained in 49 CFR 821.24(e).**


The Administrator filed three Denial letters in this matter. The first denial letter was August 29, 2011 which cited "alcoholism and psychosis,"(J.A. A14-A15). The second denial was dated October 20, 2011 which cited only "psychosis" as the reason for the denial, (J.A. A142). The third denial letter was dated June 25, 2012, two months after the scheduled first hearing in the matter. The cited denial reason in the third denial letter was "psychosis and major depression recurrent,(R.976-983). No leave of court was filed by the Administrator to continue

54

filing amended denial letters, and as a result of the filing of the second and third denial letters, Captain Roth filed a Motion to Quash on July 3rd, 2012,(R.976-983), citing 49 U.S.C. § 44703, and the jurisdiction vested by Congress unto the National Transportation Safety Board, which law divested the Administrator of the jurisdiction to take any further action regarding the denial letter without leave of the Board.

The CALJ subsequently ruled against Petitioner on the Motion to Quash, citing amongst other things Petitioner's failure to show prejudice, (J.A. A153 lines 3-6). However in his OID the CALJ concluded that Petitioner spent little time addressing major depressive disorder. This finding was arbitrary and capricious in that the first time Petitioner saw the Administrator was alleging Captain Roth had major depressive disorder was in the third amended denial letter dated June 25, 2012, after the scheduled first hearing dated May 1st and 2nd, 2012 in Washington, D.C.. That hearing was continued over objection and the Federal Air Surgeon filed a third

55

amended denial letter dated June 25, 2012, citing a history of psychosis and major depression, recurrent. This third Denial letter was not only prejudicial to Petitioner, but "Major Depression Recurrent" is not a lifetime disqualifying condition. Simply put, the record supports the fact that Captain Roth has not has Major Depression since 2000, and has not shown symptoms of same since 2000. Since this new reason for denial by the Administrator is first brought up 13 years after the diagnosis, Petitioner is indeed prejudiced by the lapse of time when trying to obtain evidence and witnesses from events 13 years ago.

Finally, the CALJ erroneously ruled that the Administrator had received "new medical evidence" pursuant to 49 C.F.R. 821.24(e) and as such was entitled to amend his Order. 49 C.F.R. 821.24(e) requires the Administrator, if he elects, to file an amended "answer" to such new medical evidence with ten days after the date on which he or she was served therewith. This requirement is very narrow and applies exclusively to Petitions for

Review under 49 U.S.C. § 44703, and is clearly not in lieu of 49 C.F.R. § 821.12. Congress, in promulgating the narrow requirements of 821.24 relating to Amending Petitions for Review, did not state that if you cannot meet this narrow requirement then use the broad requirement under 821.12 relating to enforcement proceedings.

In the instant matter, the Administrator was served with Dr. Schmitt's changed diagnosis letter (J.A. A145) on April 24, 2012, which would have given the Administrator until May 4, 2012 to amend his denial. Thereafter, the Administrator took the Deposition of Dr. Conrad Schmitt on June 4, 2012, in the presence of FAA physician Dr. Berry, (J.A. A999-A1088). Using the latter June 4, 2012 date, the Administrator had until June 14, 2012 to amend his denial. However, the third amended denial letter was dated June 25, 2012, well beyond both service dates set forth above. As such, the October 20, 2011 first amended denial should have been quashed as it was not the result of any "new medical evidence", and the second amended

denial dated June 25, 2012 should be quashed as untimely pursuant to 821.24(e), as cited and relied upon erroneously by the CALJ. Further, the Administrator failed to file amended pleadings regarding same in a timely manner, filing his Amended Answer on November 3, 2011, and his Second Amended Answer July 18, 2012, again, well beyond both service dates set forth above.

As such, the NTSB's analysis to the "Amendments to the Denial Letter", (J.A. A1441) is a clear error of law.

## CONCLUSION

For the foregoing reasons Petitioner/Appellant Frederick Roth, respectfully requests this Honorable Appellate Court reverse the National Transportation Safety Board's Order dated February 25, 2014, and thereafter permit Petitioner Frederick Roth to apply for, without undue delay, an unrestricted airman medical certificate.

Respectfully Submitted:

```
s/Joseph Michael Lamonaca
Counsel for Petitioner
755 N. Monroe Street
Media, PA 19063
(610) 558-3376 office
(888) 881-1175 facsimile
jlamonaca@avlaw.us
```

59

## COMBINED CERTIFICATIONS

1) I hereby certify that I am a member in good standing with the Bar of the Court, having been admitted on May 14, 1991;

2) I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 9483 number of words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), and this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a monospaced typeface using WordPerfect12 in 14-Point Font in Courier New Style;

3) I, Joseph Michael Lamonaca, Esquire, do hereby certify that I am this 8th day of September, 2014 serving the following persons with a true and correct copy of the attached BRIEF FOR THE PETITIONER via ECF.

60

**ECF:**

Amanda K. Bruchs, Esquire

Federal Aviation Administration

Office of Chief Counsel

800 Independence Avenue, S.W.

Washington, D.C. 20591

```
s/Joseph Michael Lamonaca
Counsel for Petitioner
755 N. Monroe Street
Media, PA 19063
(610) 558-3376 office
(888) 881-1175 facsimile
jlamonaca@avlaw.us
```

61

# ADDENDUM

# TABLE OF CONTENTS

**ITEM:**                                                    **PAGE :**

5 U.S.C. §§ 701-706..............................Add. 01

5 U.S.C. § 556(d)...............................Add. 04

49 U.S.C. § 1153................................Add. 06

49 U.S.C. § 44703..............................Add. 08

49 U.S.C. § 46110..............................Add. 10

20 C.F.R. § 404.1502...........................Add. 11

20 C.F.R. § 416.927............................Add. 13

49 C.F.R. § 821.12.............................Add. 18

49 C.F.R. § 821.24(e)..........................Add. 19

49 C.F.R. § 821.64.............................Add. 20

Fed. R. Evid. 401..............................Add. 21

Fed. R. Evid. 402..............................Add. 22

Pilot's Bill of Rights, Public Law 112-153, Section 2,(b)(1).......................................Add. 23

Federal Aviation Administrations Guide for Aviation Medical Examiners, Item 47.....................Add. 29

# THE ADMINISTRATIVE PROCEDURE ACT

## 5 U.S.C. § 701 - 708

### § Section 701. - Application; definitions

This chapter applies, according to the provisions thereof, except to the extent that -

    (1) statutes preclude judicial review; or

    (2) agency action is committed to agency discretion by law

(b) For the purpose of this chapter -

    (1) "agency" means each authority of the Government of the United States, whether or not it is within or subject to review by another agency, but does not include -

        (A) the Congress;

        (B) the courts of the United States;

        (C) the governments of the territories or possessions of the United States;

        (D) the government of the District of Columbia;

        (E) agencies composed of representatives of the parties or of representatives of organizations of the parties to the disputes determined by them;

        (F) courts martial and military commissions;

        (G) military authority exercised in the field in time of war or in occupied territory; or

        (H) functions conferred by sections 1738, 1739, 1743, and 1744 of title 12; chapter 2 of title 41; subchapter II of chapter 471 of title 49; or sections 1884, 1891-1902, and former section 1641(b)(2), of title 50, appendix; and

    (2) "person", "rule", "order", "license", "sanction", "relief", and "agency action" have the meanings given them by section 551 of this title

### § Section 702. - Right of review

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it

is against the United States or that the United States is an indispensable party. The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States: Provided, That any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance. Nothing herein

    (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or

    (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought

## § Section 703. - Form and venue of proceeding

The form of proceeding for judicial review is the special statutory review proceeding relevant to the subject matter in a court specified by statute or, in the absence or inadequacy thereof, any applicable form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus, in a court of competent jurisdiction. If no special statutory review proceeding is applicable, the action for judicial review may be brought against the United States, the agency by its official title, or the appropriate officer. Except to the extent that prior, adequate, and exclusive opportunity for judicial review is provided by law, agency action is subject to judicial review in civil or criminal proceedings for judicial enforcement

## § Section 704. - Actions reviewable

Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action. Except as otherwise expressly required by statute, agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined an application for a declaratory order, for any form of reconsideration, or, unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority

## § Section 705. - Relief pending review

When an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review. On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings

## § Section 706. - Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the

meaning or applicability of the terms of an agency action. The reviewing court shall -

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be -

> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

> (B) contrary to constitutional right, power, privilege, or immunity;

> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

> (D) without observance of procedure required by law;

> (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

> (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

USCA Case #14-1060    Document #1511129    Filed: 09/08/2014    Page 74 of 102

# Administrative Procedure Act

- UNITED STATES CODE
  - TITLE 5 - GOVERNMENT ORGANIZATION AND EMPLOYEES
    - PART I - THE AGENCIES GENERALLY
      - CHAPTER 5 - ADMINISTRATIVE PROCEDURE
        - SUBCHAPTER II - ADMINISTRATIVE PROCEDURE

---

**§ 556. Hearings; presiding employees; powers and duties; burden of proof; evidence; record as basis of decision**

(a) This section applies, according to the provisions thereof, to hearings required by section 553 or 554 of this title to be conducted in accordance with this section.

(b) There shall preside at the taking of evidence -

(1) the agency;

(2) one or more members of the body which comprises the agency; or

(3) one or more administrative law judges appointed under section 3105 of this title.

This subchapter does not supersede the conduct of specified classes of proceedings, in whole or in part, by or before boards or other employees specially provided for by or designated under statute. The functions of presiding employees and of employees participating in decisions in accordance with section 557 of this title shall be conducted in an impartial manner. A presiding or participating employee may at any time disqualify himself. On the filing in good faith of a timely and sufficient affidavit of personal bias or other disqualification of a presiding or participating employee, the agency shall determine the matter as a part of the record and decision in the case.

(c) Subject to published rules of the agency and within its powers, employees presiding at hearings may -

(1) administer oaths and affirmations;

(2) issue subpoenas authorized by law;

(3) rule on offers of proof and receive relevant evidence;

(4) take depositions or have depositions taken when the ends of justice would be served;

(5) regulate the course of the hearing;

(6) hold conferences for the settlement or simplification of the issues by consent of

USCA Case #14-1060    Document #1511129    Filed: 09/08/2014    Page 75 of 102

the parties or by the use of alternative means of dispute resolution as provided in subchapter IV of this chapter;

(7) inform the parties as to the availability of one or more alternative means of dispute resolution, and encourage use of such methods;

(8) require the attendance at any conference held pursuant to paragraph (6) of at least one representative of each party who has authority to negotiate concerning resolution of issues in controversy;

(9) dispose of procedural requests or similar matters;

(10) make or recommend decisions in accordance with section 557 of this title; and

(11) take other action authorized by agency rule consistent with this subchapter.

(d) Except as otherwise provided by statute, the proponent of a rule or order has the burden of proof. Any oral or documentary evidence may be received, but the agency as a matter of policy shall provide for the exclusion of irrelevant, immaterial, or unduly repetitious evidence. A sanction may not be imposed or rule or order issued except on consideration of the whole record or those parts thereof cited by a party and supported by and in accordance with the reliable, probative, and substantial evidence. The agency may, to the extent consistent with the interests of justice and the policy of the underlying statutes administered by the agency, consider a violation of section 557(d) of this title sufficient grounds for a decision adverse to a party who has knowingly committed such violation or knowingly caused such violation to occur. A party is entitled to present his case or defense by oral or documentary evidence, to submit rebuttal evidence, and to conduct such cross-examination as may be required for a full and true disclosure of the facts. In rule making or determining claims for money or benefits or applications for initial licenses an agency may, when a party will not be prejudiced thereby, adopt procedures for the submission of all or part of the evidence in written form.

(e) The transcript of testimony and exhibits, together with all papers and requests filed in the proceeding, constitutes the exclusive record for decision in accordance with section 557 of this title and, on payment of lawfully prescribed costs, shall be made available to the parties. When an agency decision rests on official notice of a material fact not appearing in the evidence in the record, a party is entitled, on timely request, to an opportunity to show the contrary.

---

Previous Section  |  Next Section

 PDF files require the free Adobe Reader.
More information on Adobe Acrobat PDF files is available on our Accessibility page.

# 49 U.S. Code § 1153 - Judicial review

 There is 1 Update Pending. Select the tab below to view.

Current through Pub. L. 113-142, except 128. (See Public Laws for the current Congress.)

| US Code | Notes | Updates | Authorities (CFR) |

(a) **General.—** The appropriate court of appeals of the United States or the United States Court of Appeals for the District of Columbia Circuit may review a final order of the National Transportation Safety Board under this chapter. A person disclosing a substantial interest in the order may apply for review by filing a petition not later than 60 days after the order of the Board is issued.

(b) **Persons Seeking Judicial Review of Aviation Matters.—**

(1) A person disclosing a substantial interest in an order related to an aviation matter issued by the Board under this chapter may apply for review of the order by filing a petition for review in the United States Court of Appeals for the District of Columbia Circuit or in the court of appeals of the United States for the circuit in which the person resides or has its principal place of business. The petition must be filed not later than 60 days after the order is issued. The court may allow the petition to be filed after the 60 days only if there was a reasonable ground for not filing within that 60-day period.

(2) When a petition is filed under paragraph (1) of this subsection, the clerk of the court immediately shall send a copy of the petition to the Board. The Board shall file with the court a record of the proceeding in which the order was issued.

(3) When the petition is sent to the Board, the court has exclusive jurisdiction to affirm, amend, modify, or set aside any part of the order and may order the Board to conduct further proceedings. After reasonable notice to the Board, the court may grant interim relief by staying the order or taking other appropriate action when cause for its action exists. Findings of fact by the Board, if supported by substantial evidence, are conclusive.

(4) In reviewing an order under this subsection, the court may consider an objection to an order of the Board only if the objection was made in the proceeding conducted by the Board or if there was a reasonable ground for not making the objection in the proceeding.

(5) A decision by a court under this subsection may be reviewed only by the Supreme Court under section 1254 of title 28.

(c) **Administrator Seeking Judicial Review of Aviation Matters.—** When the Administrator of the Federal Aviation Administration decides that an order of the Board under section 44703 (d), 44709, or 46301 (d)(5) of this title will have a significant adverse impact on carrying out this chapter related to an aviation matter, the Administrator may obtain judicial review

USCA Case #14-1060     Document #1511129     Filed: 09/08/2014     Page 77 of 102

of the order under section 46110 of this title. The Administrator shall be made a party to the judicial review proceedings. Findings of fact of the Board are conclusive if supported by substantial evidence.

(d) Commandant Seeking Judicial Review of Maritime Matters.— If the Commandant of the Coast Guard decides that an order of the Board issued pursuant to a review of a Coast Guard action under section 1133 of this title will have an adverse impact on maritime safety or security, the Commandant may obtain judicial review of the order under subsection (a). The Commandant, in the official capacity of the Commandant, shall be a party to the judicial review proceedings.

# 49 U.S. Code § 44703 - Airman certificates

PREV | NEXT

 There are 6 Updates Pending. Select the tab below to view.

Current through Pub. L. 113–142, except 128. (See Public Laws for the current Congress.)

| **US Code** | **Notes** | **Updates** | **Authorities (CFR)** |

(a) General.— The Administrator of the Federal Aviation Administration shall issue an airman certificate to an individual when the Administrator finds, after investigation, that the individual is qualified for, and physically able to perform the duties related to, the position to be authorized by the certificate.

(b) Contents.—

(1) An airman certificate shall—

(A) be numbered and recorded by the Administrator of the Federal Aviation Administration;

(B) contain the name, address, and description of the individual to whom the certificate is issued;

(C) contain terms the Administrator decides are necessary to ensure safety in air commerce, including terms on the duration of the certificate, periodic or special examinations, and tests of physical fitness;

(D) specify the capacity in which the holder of the certificate may serve as an airman with respect to an aircraft; and

(E) designate the class the certificate covers.

(2) A certificate issued to a pilot serving in scheduled air transportation shall have the designation "airline transport pilot" of the appropriate class.

(c) Public Information.—

(1) In general.— Subject to paragraph (2) and notwithstanding any other provision of law, the information contained in the records of contents of any airman certificate issued under this section that is limited to an airman's name, address, and ratings held shall be made available to the public after the 120th day following the date of the enactment of the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century.

(2) Opportunity to withhold information.— Before making any information concerning an airman available to the public under paragraph (1), the airman shall be given an opportunity to elect that the information not be made available to the public.

(3) Development and implementation of program.— Not later than 60 days after the date

of the enactment of the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century, the Administrator shall develop and implement, in cooperation with representatives of the aviation industry, a one-time written notification to airmen to set forth the implications of making information concerning an airman available to the public under paragraph (1) and to carry out paragraph (2). The Administrator shall also provide such written notification to each individual who becomes an airman after such date of enactment.

(d) Appeals.—

(1) An individual whose application for the issuance or renewal of an airman certificate has been denied may appeal the denial to the National Transportation Safety Board, except if the individual holds a certificate that—

(A) is suspended at the time of denial; or

(B) was revoked within one year from the date of the denial.

(2) The Board shall conduct a hearing on the appeal at a place convenient to the place of residence or employment of the applicant. The Board is not bound by findings of fact of the Administrator of the Federal Aviation Administration. At the end of the hearing, the Board shall decide whether the individual meets the applicable regulations and standards. The Administrator is bound by that decision.

(3) A person who is substantially affected by an order of the Board under this subsection, or the Administrator if the Administrator decides that an order of the Board will have a significant adverse impact on carrying out this subtitle, may seek judicial review of the order under section 46110. The Administrator shall be made a party to the judicial review proceedings. The findings of fact of the Board in any such case are conclusive if supported by substantial evidence.

# 49 U.S. Code § 46110 - Judicial review

PREV | NEXT

Current through Pub. L. 113–142, except 128. (See Public Laws for the current Congress.)

| **US Code** | **Notes** | **Updates** | **Authorities (CFR)** |

(a) Filing and Venue.— Except for an order related to a foreign air carrier subject to disapproval by the President under section 41307 or 41509 (f) of this title, a person disclosing a substantial interest in an order issued by the Secretary of Transportation (or the Under Secretary of Transportation for Security with respect to security duties and powers designated to be carried out by the Under Secretary or the Administrator of the Federal Aviation Administration with respect to aviation duties and powers designated to be carried out by the Administrator) in whole or in part under this part, part B, or subsection (l) or (s) ofsection 114 may apply for review of the order by filing a petition for review in the United States Court of Appeals for the District of Columbia Circuit or in the court of appeals of the United States for the circuit in which the person resides or has its principal place of business. The petition must be filed not later than 60 days after the order is issued. The court may allow the petition to be filed after the 60th day only if there are reasonable grounds for not filing by the 60th day.

(b) Judicial Procedures.— When a petition is filed under subsection (a) of this section, the clerk of the court immediately shall send a copy of the petition to the Secretary, Under Secretary, or Administrator, as appropriate. The Secretary, Under Secretary, or Administrator shall file with the court a record of any proceeding in which the order was issued, as provided in section 2112 of title 28.

(c) Authority of Court.— When the petition is sent to the Secretary, Under Secretary, or Administrator, the court has exclusive jurisdiction to affirm, amend, modify, or set aside any part of the order and may order the Secretary, Under Secretary, or Administrator to conduct further proceedings. After reasonable notice to the Secretary, Under Secretary, or Administrator, the court may grant interim relief by staying the order or taking other appropriate action when good cause for its action exists. Findings of fact by the Secretary, Under Secretary, or Administrator, if supported by substantial evidence, are conclusive.

(d) Requirement for Prior Objection.— In reviewing an order under this section, the court may consider an objection to an order of the Secretary, Under Secretary, or Administrator only if the objection was made in the proceeding conducted by the Secretary, Under Secretary, or Administrator or if there was a reasonable ground for not making the objection in the proceeding.

(e) Supreme Court Review.— A decision by a court under this section may be reviewed only by the Supreme Court under section 1254 of title 28.

USCA Case #14-1060    Document #1511129        Filed: 09/08/2014      Page 81 of 102

# 20 CFR 404.1502 - General definitions and terms for this subpart.

PREV | next

> There are 4 Updates appearing in the Federal Register for 20 CFR 404. View below or at eCFR (GPOAccess)

| CFR | Updates | Authorities (U.S. Code) | Rulemaking |

§ 404.1502 General definitions and terms for this subpart.

As used in the subpart—

Acceptable medical source refers to one of the sources described in § 404.1513(a) who provides evidence about your impairments. It includes treating sources, nontreating sources, and nonexamining sources.

Commissioner means the Commissioner of Social Security or his or her authorized designee.

Medical sources refers to acceptable medical sources, or other health care providers who are not acceptable medical sources.

Nonexamining source means a physician, psychologist, or other acceptable medical source who has not examined you but provides a medical or other opinion in your case. At the administrative law judge hearing and Appeals Council levels of the administrative review process, it includes State agency medical and psychological consultants, other program physicians and psychologists, and medical experts or psychological experts we consult. See § 404.1527.

Nontreating source means a physician, psychologist, or other acceptable medical source who has examined you but does not have, or did not have, an ongoing treatment relationship with you. The term includes an acceptable medical source who is a consultative examiner for us, when the consultative examiner is not your treating source. See § 404.1527.

State agency means that agency of a State which has been designated by the State to carry out the disability or blindness determination function.

Treating source means your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you. Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s). We may consider an acceptable medical source who has treated or evaluated you only a few times or only after long intervals (e.g., twice a year) to be your treating source if the nature and frequency of the treatment or evaluation is typical for your condition(s). We will not consider an acceptable medical source to be your treating source if your relationship with the source is not based on your medical

USCA Case #14-1060     Document #1511129          Filed: 09/08/2014      Page 82 of 102

need for treatment or evaluation, but solely on your need to obtain a report in support of your claim for disability. In such a case, we will consider the acceptable medical source to be a nontreating source.

We or us refers to either the Social Security Administration or the State agency making the disability or blindness determination.

You or your means, as appropriate, the person who applies for benefits or for a period of disability, the person for whom an application is filed, or the person who is receiving benefits based on disability or blindness.

USCA Case #14-1060    Document #1511129    Filed: 09/08/2014    Page 83 of 102

# 20 CFR 416.927 - Evaluating opinion evidence.

PREV | NEXT

> There are 5 Updates appearing in the Federal Register for 20 CFR 416. View below or at eCFR (GPOAccess)

**CFR** | **Updates** | **Authorities (U.S. Code)** | **Rulemaking**

§ 416.927 Evaluating opinion evidence.

(a) General.

(1)  If you are an adult, you can only be found disabled if you are unable to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. (See § 416.905.) If you are a child, you can be found disabled only if you have a medically determinable physical or mental impairment(s) that causes marked and severe functional limitations and that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. (See § 416.906.) Your impairment must result from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. (See § 416.908.)

(2)  Evidence that you submit or that we obtain may contain medical opinions. Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions.

(b) How we consider medical opinions.  In determining whether you are disabled, we will always consider the medical opinions in your case record together with the rest of the relevant evidence we receive. See § 416.920b.

(c) How we weigh medical opinions.  Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (c)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.

(1) Examining relationship.  Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.

(2) Treatment relationship.  Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and

severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

(i) **Length of the treatment relationship and the frequency of examination.** Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a nontreating source.

(ii) **Nature and extent of the treatment relationship.** Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories. For example, if your ophthalmologist notices that you have complained of neck pain during your eye examinations, we will consider his or her opinion with respect to your neck pain, but we will give it less weight than that of another physician who has treated you for the neck pain. When the treating source has reasonable knowledge of your impairment(s), we will give the source's opinion more weight than we would give it if it were from a nontreating source.

(3) **Supportability.** The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion. Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions. We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources.

(4) **Consistency.** Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5) **Specialization.** We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

(6) **Other factors.** When we consider how much weight to give to a medical opinion, we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the opinion. For example, the amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has,

regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with the other information in your case record are relevant factors that we will consider in deciding the weight to give to a medical opinion.

(d) **Medical source opinions on issues reserved to the Commissioner.** Opinions on some issues, such as the examples that follow, are not medical opinions, as described in paragraph (a)(2) of this section, but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability.

(1) **Opinions that you are disabled.** We are responsible for making the determination or decision about whether you meet the statutory definition of disability. In so doing, we review all of the medical findings and other evidence that support a medical source's statement that you are disabled. A statement by a medical source that you are "disabled" or "unable to work" does not mean that we will determine that you are disabled.

(2) **Other opinions on issues reserved to the Commissioner.** We use medical sources, including your treating source, to provide evidence, including opinions, on the nature and severity of your impairment(s). Although we consider opinions from medical sources on issues such as whether your impairment(s) meets or equals the requirements of any impairment(s) in the Listing of Impairments in appendix 1 to subpart P of part 404 of this chapter, your residual functional capacity (see §§ 416.945and 416.946), or the application of vocational factors, the final responsibility for deciding these issues is reserved to the Commissioner.

(3) We will not give any special significance to the source of an opinion on issues reserved to the Commissioner described in paragraphs (d)(1) and (d)(2) of this section.

(e) **Opinions of nonexamining sources.** We consider all evidence from nonexamining sources to be opinion evidence. When we consider the opinions of nonexamining sources, we apply the rules in paragraphs (a) through (d) of this section. In addition, the following rules apply to State agency medical and psychological consultants, other program physicians and psychologists, and medical experts we consult in connection with administrative law judge hearings and Appeals Council review:

(1) In claims adjudicated by the State agency, a State agency medical or psychological consultant may make the determination of disability together with a State agency disability examiner or provide one or more medical opinions to a State agency disability examiner when the disability examiner makes the initial or reconsideration determination alone (See§ 416.1015(c) of this part). The following rules apply:

(i) When a State agency medical or psychological consultant makes the determination together with a State agency disability examiner at the initial or reconsideration level of the administrative review process as provided in § 416.1015(c)(1), he or she will consider the evidence in your case record and make findings of fact about the medical issues, including, but not limited to, the existence and severity of your impairment(s), the existence and severity of your symptoms, whether your impairment(s) meets or medically equals the requirements for any impairment listed in appendix 1 to subpart P of part 404 of this chapter, and your

residual functional capacity. These administrative findings of fact are based on the evidence in your case but are not in themselves evidence at the level of the administrative review process at which they are made.

(ii)  When a State agency disability examiner makes the initial determination alone as provided in § 416.1015(c)(3), he or she may obtain the opinion of a State agency medical or psychological consultant about one or more of the medical issues listed in paragraph (e)(1)(i) of this section. In these cases, the State agency disability examiner will consider the opinion of the State agency medical or psychological consultant as opinion evidence and weigh this evidence using the relevant factors in paragraphs (a) through (e) of this section.

(iii)  When a State agency disability examiner makes a reconsideration determination alone as provided in § 416.1015(c)(3), he or she will consider findings made by a State agency medical or psychological consultant at the initial level of the administrative review process and any opinions provided by such consultants at the initial and reconsideration levels as opinion evidence and weigh this evidence using the relevant factors in paragraphs (a) through (e) of this section.

(2)  Administrative law judges are responsible for reviewing the evidence and making findings of fact and conclusions of law. They will consider opinions of State agency medical or psychological consultants, other program physicians and psychologists, and medical experts as follows:

(i)  Administrative law judges are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists. State agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists are highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation. Therefore, administrative law judges must consider findings and other opinions of State agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists as opinion evidence, except for the ultimate determination about whether you are disabled (see §416.912(b)(8)).

(ii)  When an administrative law judge considers findings of a State agency medical or psychological consultant or other program physician, psychologist, or other medical specialist, the administrative law judge will evaluate the findings using the relevant factors in paragraphs (a) through (d) of this section, such as the consultant's medical specialty and expertise in our rules, the supporting evidence in the case record, supporting explanations the medical or psychological consultant provides, and any other factors relevant to the weighing of the opinions. Unless a treating source's opinion is given controlling weight, the administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician, psychologist, or other medical specialist, as the administrative law judge must do for any opinions from treating sources, nontreating sources, and other nonexamining sources who do not work for us.

(iii)  Administrative law judges may also ask for and consider opinions from medical experts

on the nature and severity of your impairment(s) and on whether your impairment(s) equals the requirements of any impairment listed in appendix 1 to subpart P of part 404 of this chapter. When administrative law judges consider these opinions, they will evaluate them using the rules in paragraphs (a) through (d) of this section.

(3) When the Appeals Council makes a decision, it will follow the same rules for considering opinion evidence as administrative law judges follow.

USCA Case #14-1060    Document #1511129    Filed: 09/08/2014    Page 88 of 102

# 49 CFR 821.12 - AMENDMENT AND WITHDRAWAL OF PLEADINGS.

PREVIOUS | NEXT

 There are 2 Updates appearing in the Federal Register for 49 CFR 821. View below or at eCFR (GPOAccess)

| CFR | Updates | Authorities (U.S. Code) | Rulemaking |

§ 821.12 Amendment and withdrawal of pleadings.

(a) Amendment.  At any time more than 15 days prior to the hearing, a party may amend its pleadings by filing an amended pleading with the Board and serving copies thereof on all other parties. After that time, amendment shall be allowed only at the discretion of the law judge. In the case of amendment of an answerable pleading, the law judge shall allow any adverse party a reasonable time to object or answer. Amendments to complaints shall be consistent with the requirements of 49 U.S.C. 44709(c) and 44710(c).

(b) Withdrawal.  Except in the case of a petition for review, an appeal to the Board, a complaint, or an appeal from a law judge's initial decision or appealable order, pleadings may be withdrawn only upon approval of the law judge or the Board.

# 49 CFR 821.24 - INITIATION OF PROCEEDING.

prev | NEXT

 There are 2 Updates appearing in the Federal Register for 49 CFR 821. View below or at eCFR (GPOAccess)

| CFR | Updates | Authorities (U.S. Code) | Rulemaking |

§ 821.24 Initiation of proceeding.

(a) Petition for review. Where the Administrator has denied an application for the issuance or renewal of an airman certificate, the applicant may file with the Board a petition for review of the Administrator's denial. The petition must be filed with the Board within 60 days after the date on which notice of the Administrator's denial was served on the petitioner.

(b) Form and content of petition. The petition may be in letter form. It shall identify the Administrator's certificate denial action, and contain a complete but concise statement of the reasons why the petitioner believes the certificate denial was erroneous.

(c) Answer to petition. The Administrator shall file an answer to the petition for review within 20 days after the date of service of the petition. The answer shall specifically address each of the reasons set forth in the petition as to why the petitioner believes the certificate denial was erroneous.

(d) Stay of proceeding pending request for special issuance (restricted) medical certificate. The Board lacks the authority to review requests for special issuance (restricted) medical certificates, or to direct that they be issued. Where a request for a special issuance certificate has been filed with the Administrator pursuant to the Federal Aviation Regulations, the Board will, upon the petitioner's written request, hold a petition for review of a denial of an unrestricted medical certificate in abeyance pending final action by the Administrator on the special issuance request, but for no longer than 180 days after the date on which the unrestricted medical certificate denial was issued.

(e) New evidence. Where review of a denial of an unrestricted medical certificate is at issue, if the petitioner has undergone medical testing or evaluation in addition to that already submitted or known to the Administrator, and wishes to introduce the results into the record, such new medical evidence must be served on the Administrator at least 30 days prior to the hearing. Absent good cause, failure to so timely serve the new medical evidence on the Administrator will result in the exclusion of such evidence from the record. The Administrator may amend his or her answer to respond to such new medical evidence within 10 days after the date on which he or she was served therewith.

USCA Case #14-1060    Document #1511129    Filed: 09/08/2014    Page 90 of 102

# ELECTRONIC CODE OF FEDERAL REGULATIONS

## e-CFR Data is current as of August 26, 2014

Title 49 → Subtitle B → Chapter VIII → Part 821 → Subpart K → §821.64

Title 49: Transportation
PART 821—RULES OF PRACTICE IN AIR SAFETY PROCEEDINGS
Subpart K—Judicial Review of Board Orders

---

### §821.64   Judicial review.

(a) *General.* Judicial review of a final order of the Board may be sought as provided in 49 U.S.C. 1153 and 46110 by the filing of a petition for review with the appropriate United States Court of Appeals or United States District Court, pursuant to the provisions of Pub. L. 112-53, 126 Stat. 1159 (August 3, 2012), 49 U.S.C. 44703 note. Such petition is due within 60 days of the date of entry (*i.e.,* service date) of the Board's order. Under the applicable statutes, any party may appeal the Board's decision. The Board is not a party in interest in such appellate proceedings and, accordingly, does not typically participate in the judicial review of its decisions. In matters appealed by the Administrator, the other parties should anticipate the need to make their own defense.

(b) *Stay pending judicial review.* No request for a stay pending judicial review will be entertained unless it is served on the Board within 15 days after the date of service of the Board's order. The non-moving party may, within 5 days after the date of service of such a motion, file a reply thereto.

[68 FR 22625, Apr. 29, 2003, as amended at 77 FR 63245, Oct. 16, 2012; 77 FR 63253, Oct. 16, 2012; 78 FR 57534, Sept. 19, 2013]

---

For questions or comments regarding e-CFR editorial content, features, or design, email ecfr@nara.gov.
For questions concerning e-CFR programming and delivery issues, email webteam@gpo.gov.

USCA Case #14-1060    Document #1511129    Filed: 09/08/2014    Page 91 of 102

# RULE 401. TEST FOR RELEVANT EVIDENCE

Evidence is relevant if:

(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and

(b) the fact is of consequence in determining the action.

USCA Case #14-1060   Document #1511129   Filed: 09/08/2014   Page 92 of 102

# RULE 402. GENERAL ADMISSIBILITY OF RELEVANT EVIDENCE

Relevant evidence is admissible unless any of the following provides otherwise:

- the United States Constitution;
- a federal statute;
- these rules; or
- other rules prescribed by the Supreme Court.

Irrelevant evidence is not admissible.



S. 1335

# One Hundred Twelfth Congress
## of the
## United States of America

### AT THE SECOND SESSION

*Begun and held at the City of Washington on Tuesday,*
*the third day of January, two thousand and twelve*

## An Act

To amend title 49, United States Code, to provide rights for pilots, and for other
purposes.

*Be it enacted by the Senate and House of Representatives of*
*the United States of America in Congress assembled,*

**SECTION 1. SHORT TITLE.**

This Act may be cited as the "Pilot's Bill of Rights".

**SEC. 2. FEDERAL AVIATION ADMINISTRATION ENFORCEMENT PRO-
CEEDINGS AND ELIMINATION OF DEFERENCE.**

(a) IN GENERAL.—Any proceeding conducted under subpart C,
D, or F of part 821 of title 49, Code of Federal Regulations, relating
to denial, amendment, modification, suspension, or revocation of
an airman certificate, shall be conducted, to the extent practicable,
in accordance with the Federal Rules of Civil Procedure and the
Federal Rules of Evidence.

(b) ACCESS TO INFORMATION.—

(1) IN GENERAL.—Except as provided under paragraph (3),
the Administrator of the Federal Aviation Administration
(referred to in this section as the "Administrator") shall provide
timely, written notification to an individual who is the subject
of an investigation relating to the approval, denial, suspension,
modification, or revocation of an airman certificate under
chapter 447 of title 49, United States Code.

(2) INFORMATION REQUIRED.—The notification required
under paragraph (1) shall inform the individual—

(A) of the nature of the investigation;

(B) that an oral or written response to a Letter of
Investigation from the Administrator is not required;

(C) that no action or adverse inference can be taken
against the individual for declining to respond to a Letter
of Investigation from the Administrator;

(D) that any response to a Letter of Investigation from
the Administrator or to an inquiry made by a representa-
tive of the Administrator by the individual may be used
as evidence against the individual;

(E) that the releasable portions of the Administrator's
investigative report will be available to the individual;
and

(F) that the individual is entitled to access or otherwise
obtain air traffic data described in paragraph (4).

S. 1335—2

(3) EXCEPTION.—The Administrator may delay timely notification under paragraph (1) if the Administrator determines that such notification may threaten the integrity of the investigation.

(4) ACCESS TO AIR TRAFFIC DATA.—

(A) FAA AIR TRAFFIC DATA.—The Administrator shall provide an individual described in paragraph (1) with timely access to any air traffic data in the possession of the Federal Aviation Administration that would facilitate the individual's ability to productively participate in a proceeding relating to an investigation described in such paragraph.

(B) AIR TRAFFIC DATA DEFINED.—As used in subparagraph (A), the term "air traffic data" includes—

(i) relevant air traffic communication tapes;

(ii) radar information;

(iii) air traffic controller statements;

(iv) flight data;

(v) investigative reports; and

(vi) any other air traffic or flight data in the Federal Aviation Administration's possession that would facilitate the individual's ability to productively participate in the proceeding.

(C) GOVERNMENT CONTRACTOR AIR TRAFFIC DATA.—

(i) IN GENERAL.—Any individual described in paragraph (1) is entitled to obtain any air traffic data that would facilitate the individual's ability to productively participate in a proceeding relating to an investigation described in such paragraph from a government contractor that provides operational services to the Federal Aviation Administration, including control towers and flight service stations.

(ii) REQUIRED INFORMATION FROM INDIVIDUAL.—The individual may obtain the information described in clause (i) by submitting a request to the Administrator that—

(I) describes the facility at which such information is located; and

(II) identifies the date on which such information was generated.

(iii) PROVISION OF INFORMATION TO INDIVIDUAL.—If the Administrator receives a request under this subparagraph, the Administrator shall—

(I) request the contractor to provide the requested information; and

(II) upon receiving such information, transmitting the information to the requesting individual in a timely manner.

(5) TIMING.—Except when the Administrator determines that an emergency exists under section 44709(c)(2) or 46105(c), the Administrator may not proceed against an individual that is the subject of an investigation described in paragraph (1) during the 30-day period beginning on the date on which the air traffic data required under paragraph (4) is made available to the individual.

(c) AMENDMENTS TO TITLE 49.—

S. 1335—3

(1) AIRMAN CERTIFICATES.—Section 44703(d)(2) of title 49, United States Code, is amended by striking "but is bound by all validly adopted interpretations of laws and regulations the Administrator carries out unless the Board finds an interpretation is arbitrary, capricious, or otherwise not according to law".

(2) AMENDMENTS, MODIFICATIONS, SUSPENSIONS, AND REVOCATIONS OF CERTIFICATES.—Section 44709(d)(3) of such title is amended by striking "but is bound by all validly adopted interpretations of laws and regulations the Administrator carries out and of written agency policy guidance available to the public related to sanctions to be imposed under this section unless the Board finds an interpretation is arbitrary, capricious, or otherwise not according to law".

(3) REVOCATION OF AIRMAN CERTIFICATES FOR CONTROLLED SUBSTANCE VIOLATIONS.—Section 44710(d)(1) of such title is amended by striking "but shall be bound by all validly adopted interpretations of laws and regulations the Administrator carries out and of written agency policy guidance available to the public related to sanctions to be imposed under this section unless the Board finds an interpretation is arbitrary, capricious, or otherwise not according to law".

(d) APPEAL FROM CERTIFICATE ACTIONS.—

(1) IN GENERAL.—Upon a decision by the National Transportation Safety Board upholding an order or a final decision by the Administrator denying an airman certificate under section 44703(d) of title 49, United States Code, or imposing a punitive civil action or an emergency order of revocation under subsections (d) and (e) of section 44709 of such title, an individual substantially affected by an order of the Board may, at the individual's election, file an appeal in the United States district court in which the individual resides or in which the action in question occurred, or in the United States District Court for the District of Columbia. If the individual substantially affected by an order of the Board elects not to file an appeal in a United States district court, the individual may file an appeal in an appropriate United States court of appeals.

(2) EMERGENCY ORDER PENDING JUDICIAL REVIEW.—Subsequent to a decision by the Board to uphold an Administrator's emergency order under section 44709(e)(2) of title 49, United States Code, and absent a stay of the enforcement of that order by the Board, the emergency order of amendment, modification, suspension, or revocation of a certificate shall remain in effect, pending the exhaustion of an appeal to a Federal district court as provided in this Act.

(e) STANDARD OF REVIEW.—

(1) IN GENERAL.—In an appeal filed under subsection (d) in a United States district court, the district court shall give full independent review of a denial, suspension, or revocation ordered by the Administrator, including substantive independent and expedited review of any decision by the Administrator to make such order effective immediately.

(2) EVIDENCE.—A United States district court's review under paragraph (1) shall include in evidence any record of the proceeding before the Administrator and any record of the proceeding before the National Transportation Safety

S. 1335—4

Board, including hearing testimony, transcripts, exhibits, decisions, and briefs submitted by the parties.

SEC. 3. NOTICES TO AIRMEN.

(a) IN GENERAL.—

(1) DEFINITION.—In this section, the term "NOTAM" means Notices to Airmen.

(2) IMPROVEMENTS.—Not later than 180 days after the date of the enactment of this Act, the Administrator of the Federal Aviation Administration shall begin a Notice to Airmen Improvement Program (in this section referred to as the "NOTAM Improvement Program")—

(A) to improve the system of providing airmen with pertinent and timely information regarding the national airspace system;

(B) to archive, in a public central location, all NOTAMs, including the original content and form of the notices, the original date of publication, and any amendments to such notices with the date of each amendment; and

(C) to apply filters so that pilots can prioritize critical flight safety information from other airspace system information.

(b) GOALS OF PROGRAM.—The goals of the NOTAM Improvement Program are—

(1) to decrease the overwhelming volume of NOTAMs an airman receives when retrieving airman information prior to a flight in the national airspace system;

(2) make the NOTAMs more specific and relevant to the airman's route and in a format that is more useable to the airman;

(3) to provide a full set of NOTAM results in addition to specific information requested by airmen;

(4) to provide a document that is easily searchable; and

(5) to provide a filtering mechanism similar to that provided by the Department of Defense Notices to Airmen.

(c) ADVICE FROM PRIVATE SECTOR GROUPS.—The Administrator shall establish a NOTAM Improvement Panel, which shall be comprised of representatives of relevant nonprofit and not-for-profit general aviation pilot groups, to advise the Administrator in carrying out the goals of the NOTAM Improvement Program under this section.

(d) PHASE-IN AND COMPLETION.—The improvements required by this section shall be phased in as quickly as practicable and shall be completed not later than the date that is 1 year after the date of the enactment of this Act.

SEC. 4. MEDICAL CERTIFICATION.

(a) ASSESSMENT.—

(1) IN GENERAL.—Not later than 180 days after the date of the enactment of this Act, the Comptroller General of the United States shall initiate an assessment of the Federal Aviation Administration's medical certification process and the associated medical standards and forms.

(2) REPORT.—The Comptroller General shall submit a report to Congress based on the assessment required under paragraph (1) that examines—

(A) revisions to the medical application form that would provide greater clarity and guidance to applicants;

S. 1335—5

(B) the alignment of medical qualification policies with present-day qualified medical judgment and practices, as applied to an individual's medically relevant circumstances; and

(C) steps that could be taken to promote the public's understanding of the medical requirements that determine an airman's medical certificate eligibility.

(b) GOALS OF THE FEDERAL AVIATION ADMINISTRATION'S MEDICAL CERTIFICATION PROCESS.—The goals of the Federal Aviation Administration's medical certification process are—

(1) to provide questions in the medical application form that—

(A) are appropriate without being overly broad;

(B) are subject to a minimum amount of misinterpretation and mistaken responses;

(C) allow for consistent treatment and responses during the medical application process; and

(D) avoid unnecessary allegations that an individual has intentionally falsified answers on the form;

(2) to provide questions that elicit information that is relevant to making a determination of an individual's medical qualifications within the standards identified in the Administrator's regulations;

(3) to give medical standards greater meaning by ensuring the information requested aligns with present-day medical judgment and practices; and

(4) to ensure that—

(A) the application of such medical standards provides an appropriate and fair evaluation of an individual's qualifications; and

(B) the individual understands the basis for determining medical qualifications.

(c) ADVICE FROM PRIVATE SECTOR GROUPS.—The Administrator shall establish a panel, which shall be comprised of representatives of relevant nonprofit and not-for-profit general aviation pilot groups, aviation medical examiners, and other qualified medical experts, to advise the Administrator in carrying out the goals of the assessment required under this section.

(d) FEDERAL AVIATION ADMINISTRATION RESPONSE.—Not later than 1 year after the issuance of the report by the Comptroller

S. 1335—6

General pursuant to subsection (a)(2), the Administrator shall take appropriate actions to respond to such report.

*Speaker of the House of Representatives.*

*Vice President of the United States and*
*President of the Senate.*

Guide for Aviation Medical Examiners

### ITEM 47. Psychiatric

| CHECK EACH ITEM IN APPROPRIATE COLUMN | NORMAL | ABNORMAL |
|---|---|---|
| 47. Psychiatric (Appearance, behavior, mood, communication, and memory) | | |

## I. Code of Federal Regulations

**All Classes: 14 CFR 67.107(a)(b)(c), 67.207(a)(b)(c), and 67.307(a)(b)(c)**

(a) No established medical history or clinical diagnosis of any of the following:

    (1) A personality disorder that is severe enough to have repeatedly manifested itself by overt acts.

    (2) A psychosis. As used in this section, "psychosis" refers to a mental disorder in which:

        (i) The individual has manifested delusions, hallucinations, grossly bizarre or disorganized behavior, or other commonly accepted symptoms of this condition; or

        (ii) The individual may reasonably be expected to manifest delusions, hallucinations, grossly bizarre or disorganized behavior, or other commonly accepted symptoms of this condition.

    (3) A bipolar disorder.

    (4) Substance dependence, except where there is established clinical evidence, satisfactory to the Federal Air Surgeon, of recovery, including sustained total abstinence from the substance(s) for not less than the preceding 2 years.  As used in this section -

        (i) "Substance" includes: alcohol; other sedatives and hypnotics; anxiolytics; opioids; central nervous system stimulants such as cocaine, amphetamines, and similarly acting sympathomimetics; hallucinogens; phencyclidine or similarly acting arylcyclohexylamines; cannabis; inhalants; and other psychoactive drugs and chemicals; and

        (ii) "Substance dependence" means a condition in which a person is dependent on a substance, other than tobacco or ordinary xanthine-containing (e.g., caffeine) beverages, as evidenced by-

            (A) Increased tolerance
            (B) Manifestation of withdrawal symptoms;
            (C) Impaired control of use; or
            (D) Continued use despite damage to physical health or impairment of

**LAST UPDATE**: May 16, 2014        138

social, personal, or occupational functioning.

(b) No substance abuse within the preceding 2 years defined as:

    (1) Use of a substance in a situation in which that use was physically hazardous, if there has been at any other time an instance of the use of a substance also in a situation in which that use was physically hazardous;

    (2) A verified positive drug test result, an alcohol test result of 0.04 or greater alcohol concentration, or a refusal to submit to a drug or alcohol test required by the U.S. Department of Transportation or an agency of the U.S. Department of Transportation; or

    (3) Misuse of a substance that the Federal Air Surgeon, based on case history and appropriate, qualified medical judgment relating to the substance involved, finds-

        (i) Makes the person unable to safely perform the duties or exercise the privileges of the airman certificate applied for or held; or

        (ii) May reasonably be expected, for the maximum duration of the airman medical certificate applied for or held, to make the person unable to perform those duties or exercise those privileges.

(c) No other personality disorder, neurosis, or other mental condition that the Federal Air Surgeon, based on the case history and appropriate, qualified medical judgment relating to the condition involved, finds-

    (1) Makes the person unable to safely perform the duties or exercise the privileges of the airman certificate applied for or held; or

    (2) May reasonably be expected, for the maximum duration of the airman medical certificate applied for or held, to make the person unable to perform those duties or exercise those privileges.

(Also see **Items 18.m., 18.n.,** and **18.p.**)

**II. Examination Techniques**

The FAA does not expect the Examiner to perform a formal psychiatric examination. However, the Examiner should form a general impression of the emotional stability and mental state of the applicant.  There is a need for discretion in the Examiner/applicant relationship consonant with the FAA's aviation safety mission and the concerns of all applicants regarding disclosure to a public agency of sensitive information that may not be pertinent to aviation safety.  Examiners must be sensitive to this need while, at the same time, collect what is necessary for a certification decision.  When a question arises, the Federal Air Surgeon encourages Examiners first to check this Guide for

Aviation Medical Examiners and other FAA informational documents. If the question remains unresolved, the Examiner should seek advice from a RFS or the Manager of the AMCD.

Review of the applicant's history as provided on the application form may alert the Examiner to gather further important factual information. Information about the applicant may be found in items related to age, pilot time, and class of certificate for which applied. Information about the present occupation and employer also may be helpful. If any psychotropic drugs are or have been used, followup questions are appropriate. Previous medical denials or aircraft accidents may be related to psychiatric problems.

Psychiatric information can be derived from the individual items in medical history (**Item 18**). Any affirmative answers to Item 18.m., " Mental disorders of any sort; depression, anxiety, etc.," or Item 18.p., "Suicide attempt," are significant. Any disclosure of current or previous alcohol or drug problems requires further clarification. A record of traffic violations may reflect certain personality problems or indicate an alcohol problem. Affirmative answers related to rejection by military service or a military medical discharge require elaboration. Reporting symptoms such as headaches or dizziness, or even heart or stomach trouble, may reflect a history of anxiety rather than a primary medical problem in these areas. Sometimes, the information applicants give about their previous diagnoses is incorrect, either because the applicant is unsure of the correct information or because the applicant chooses to minimize past difficulties. If there was a hospital admission for any emotionally related problem, it will be necessary to obtain the entire record.

Valuable information can be derived from the casual conversation that occurs during the physical examination. Some of this conversation will reveal information about the family, the job, and special interests. Even some personal troubles may be revealed at this time. The Examiner's questions should not be stilted or follow a regular pattern; instead, they should be a natural extension of the Examiner's curiosity about the person being examined. Information about the motivation for medical certification and interest in flying may be revealing. A formal Mental Status Examination is unnecessary. For example, it is not necessary to ask about time, place, or person to discover whether the applicant is oriented. Information about the flow of associations, mood, and memory, is generally available from the usual interactions during the examination. Indication of cognitive problems may become apparent during the examination. Such problems with concentration, attention, or confusion during the examination or slower, vague responses should be noted and may be cause for deferral.

The Examiner should make observations about the following specific elements and should note on the form any gross or notable deviations from normal:

1. Appearance (abnormal if dirty, disheveled, odoriferous, or unkempt);

2. Behavior (abnormal if uncooperative, bizarre, or inexplicable);

3. Mood (abnormal if excessively angry, sad, euphoric, or labile);

4. Communication (abnormal if incomprehensible, does not answer questions directly);

5. Memory (abnormal if unable to recall recent events); and

6. Cognition (abnormal if unable to engage in abstract thought, or if delusional or hallucinating).

Significant observations during this part of the medical examination should be recorded in Item 60, of the application form. The Examiner, upon identifying any significant problems, should defer issuance of the medical certificate and report findings to the FAA. This could be accomplished by contacting a RFS or the Manager of the AMCD.

### III. Aerospace Medical Disposition

A. General Considerations. It must be pointed out that considerations for safety, which in the "mental" area are related to a compromise of judgment and emotional control or to diminished mental capacity with loss of behavioral control, are not the same as concerns for emotional health in everyday life. Some problems may have only a slight impact on an individual's overall capacities and the quality of life but may nevertheless have a great impact on safety. Conversely, many emotional problems that are of therapeutic and clinical concern have no impact on safety.

B. Denials. The FAA has concluded that certain psychiatric conditions are such that their presence or a past history of their presence is sufficient to suggest a significant potential threat to aviation safety. It is, therefore, incumbent upon the Examiner to be aware of any indications of these conditions currently or in the past, and to deny or defer issuance of the medical certificate to an applicant who has a history of these conditions. An applicant who has a current diagnosis or history of these conditions may request the FAA to grant an Authorization under the special issuance section of part 67 (14 CFR 67.401) and, based upon individual considerations, the FAA may grant such an issuance.

**All applicants with any of the following conditions must be denied or deferred:**
Attention deficit/hyperactivity, bipolar disorder, personality disorder, psychosis, substance abuse, substance ddependence, suicide attempt.

**In some instances, the following conditions may also warrant denial or deferral:**
Adjustment disorder; bereavement; dysthymic; or minor depression; use of psychotropic medications for smoking cessation

**For evaluation guidance, see specification sheets in <u>Disease Protocols.</u>**